471 So.2d 731 (1985)
SUCCESSION OF Jose Cipriano VELASQUEZ-BAIN A/K/A Jose Cipriano Velasquez.
No. CA 2355.
Court of Appeal of Louisiana, Fourth Circuit.
April 9, 1985.
Rehearing Denied June 26, 1985.
*732 David A. Kattan, Arthur L. Ballin, New Orleans, for plaintiffs-appellants.
Clifford P. Delaup, Henry L. Klein, New Orleans, for defendants-appellees.
J. David Forsyth, Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, for First Nat. Bank of Commerce (As Successor by Merger to The Bank of New Orleans and Trust Co.)
Before GARRISON, BYRNES, and CIACCIO, JJ.
GARRISON, Judge.
This is an appeal from a judgment of the district court rendered July 28, 1983 granting a declaratory judgment in favor of Julio Guillermo Noltenius, Maria Adela Noltenius, Margoth Aimee Noltenius De Quiros, Maria Alicia Noltenius De Velanova, Jose Cipriano Noltenius (hereinafter, "The Noltenius heirs") and the Bank of New Orleans (BNO), and against Julia Margarita Zuniga Bain, Martha Velasquez De Diaz Bustamente, Adriana Siri De Lopez Y Maria Regina Siri De Reyes, Judith Velasquez De Bogran, Oscar Siri Zuniga, Santos Francisco Valencia, Carlos Wilfredo Cruz Mejia, Hijos De Enrique Y Rafael Cordona, Coronel Lenin O'Connor Bain, Herminia Torcios Reina, Victoriano Cruz Lozano, Cruz Blanca Hondurena, Asilo De Ancia Nos, and Mesa Redonda Panamericana Seccion De Tegucigalpa[1] (hereinafter "the donees").

I. Procedural History of the Case
On November 13, 1976, Jose Cipriano Velasquez Bain, a resident of San Salvador, El Salvador and a Honduran national died in El Salvador. He left a will executed on October 6, 1976 in the city of San Salvadore, El Salvadore before Jose Mauricio Martinez Larin, a Salvadorian Notary. In the will, the decedent disposed of various properties. Decedent's property included Certificates of Deposit in the Bank of New Orleans. Accordingly, ancillary probate proceedings were opened in the Civil District Court for the Parish of Orleans, the situs of this property, by the filing of a petition for same on December 7, 1977 by the Noltenius heirs above.
On February 2, 1978, the "donees" named above filed an "Opposition to Probate of Will" alleging among other things,[2] that the property at issue had been previously disposed of by Mr. Velasquez-Bain by a donation inter vivos by notarial act dated June 7, 1975. The opposition further alleged that decedent had "effectively, legally, and conclusively disposed of said deposit" and that since the donor no longer owned the Certificates of Deposit at the time of his death, he could not validly dispose thereof and, alternatively, any attempted *733 disposition thereof would be "of no effect."
On February 21, 1978 the "donees" filed a petition for Declaratory Judgment seeking to be declared the sole and rightful owners of a Certificate of Deposit in the name of Jose Cipriano Velasquez-Bain, in the sum of $250,000.00 plus accrued interest. They further alleged ownership in the following percentages:

"Julia Margarita Zuniga Bain 15%
Martha Velasquez de Diaz Bustamenta 15%
Adriana Siri De Lopez Y Maria Regina
 Siri De Reyes 15%
Judith Valasquez de Bogran 10%
Oscar Siri Zuniga 10%
Santos Francisco Valencia 7½%
Carlos Wilfredo Cruz Mejia 7½%
Hijos De Enrique y Rafael Cardona 5% divided
 between the
 children
Coronel Lenin O'Connor Bain 5%
Herminia Turcios Reina 2½%
Victoriano Cruz Lozano 2½%
Cruz Blanca Hondurena: Asilo De
 Ancia Nos 2½% each
Mesa Redonda Panamericana Seccion de
 Tegucigalpa 2½%

During the course of litigation, a question arose which caused this case to be appealed to this court previously. Succession of Velasquez-Bain, 415 So.2d 1013 (La.App. 4th, 1982) (hereinafter "Velasquez I"), was heard by the panel of Judges Barry, Ward and Byrnes with Judge Byrnes as organ of the court:
"This is an appeal from a trial court ruling dismissing appellants' petition for a Declaratory Judgment recognizing them as owners of certain certificates of deposit because of the failure of appellant to produce a photocopy of the donation inter vivos conveying ownership of the certificates of deposit. For the reasons below we reverse the lower court with instructions to proceed with the Declaratory Judgment rule using the certified copy of the donation inter vivos as presented by appellants rather than the original donation inter vivos or photocopy thereof as originally ordered by the trial court.
The issues presented on appeal, as seen by this court, are but two. The first issue presented is whether a duly certified and authenticated copy of a foreign notarial act will serve as the best evidence when the original act or photostat thereof cannot be produced. The second issue arises from the first: where there exist allegations of forgery and other improprieties pertaining to the form of the instrument itself and relating to the characteristics of the original document, is the burden on the appellants to produce the original instrument, or photocopy thereof, or is the burden placed on the party who alleges fraud, forgery and other improprieties which go to the very heart of the document?
The certified and authenticated copy of the donation inter vivos was presented to the trial court attached to a letter signed by the American Counsel for Honduras, which stated that full faith and credit was due the attached donation. We are of the opinion this satisfies the requirements of La.R.S. 35:551 et. seq., and therefore we accept the donation as having full force and effect of an authentic act executed in this state."
(AT 1013-1014).
* * * * * *
"The second issue presented this court, that of the alleged forgery of the donation inter vivos, is now dealt with. LSA-C.C. Art. 2236 states:
`An authentic act is full proof of the agreement contained in it, against the contracting parties and their heirs or assigns, unless it is declared and proved a forgery.'

The latest pronouncement of the courts pertaining to the burden of proof in cases of alleged forgeries comes in Coleman v. Egle, 376 So.2d 983 (La.App.1st Cir.1979), Writ denied 379 So.2d 15 (La. 1980) whereby the court stated that the burden of proof of a forgery falls squarely on he who alleges the forgery...
It is, therefore, the finding of the court that if in the course of the Declaratory Judgment rule to be heard by the lower court, allegations of fraud and forgery do indeed present themselves, it is up to the parties alleging the forgery to prove *734 by whatever means necessary the existence of the allegations, since the certified and authenticated copy as presented, absent such allegations, is sufficient proof of the existence of the donation inter vivos."
(AT 1016)(emphasis added).
Additionally, Judge Barry concurred stating:
"Appellant failed to comply with the lower court's order to produce a photostatic copy of the donation. I'm satisfied a photocopy of the `protocol' can be made. However, appellees attack the validity of the instrument, must bear the burden of proof, and will have their opportunity on remand."
(AT 1016).
Accordingly, the case was remanded.
On May 3, 1983 via a letter addressed to the Chief Judge of the Fourth Circuit, the newly appointed Consul General of Honduras in New Orleans, Francisco Lopez Reyes transmitted to this court Letters Rogatory from the Supreme Court of Justice of Honduras (in Spanish with an English translation) and a photocopy of the "Suplicatorio" from the same court in Spanish. Thus, in accordance with proper court procedure, on May 5, 1983, this court by order of the Chief Judge, transmitted the documents to the Civil District Court. Mr. Reyes stated in his letter that he was forwarding the documents at the request of the "donees".[3]
On July 28, 1983, after proof of forgery was offered, the trial court rendered the judgment on appeal in this instance.
The trial court judge provided the following reasons for judgment:
"Petitioners allege that by authentic act, the late Jose Cipriano Velasquez-Bain, a/k/a Jose Cipriano Velasquez, donated funds on deposit in the Bank of New Orleans and Trust Company to the said petitioners. Respondents deny that any donation was ever made and that the Last Will and Testament of the decedent should be executed. This latter issue will be addressed later. Suffice it to point out that the Act of `Donation Inter Vivos' bears a date of June 7, 1975, while the `Will' bears the date of October 6, 1976.
"During the course of the trial on the merits, counsel for Respondents launched a broad attack on the instrument purporting to be the Act of Donation, urging that it was a forgery and that Petitioners' witnesses were untruthful and were, in fact, attempting to perpetuate a fraud upon the Court. Expectedly, counsel for Petitioners urged that the Act was genuine and that the explanations for differences in appearance of the handwriting were easily explainable and that Petitioners' witnesses were believable.
Perhaps a part of the problem which caused Petitioners and Respondents some difficulty in appreciating all of the issues as this Court views this case, was the declaration by the Court of Appeals: `... if in the course of the Declaratory Judgment rule to be heard by the lower court, allegations of fraud and forgery do present themselves, it is up to the parties alleging the forgery to prove by whatever means necessary the existence of the allegations, since the certified and authenticated copy as presented, absent such allegations, is sufficient proof of the existence of the donation inter vivos.' Succession of Jose Cipriano Velasques-Bain, 415 So.2d 1013 ([La.App].1982)
This Court recognizes the significance of the declaration but also views with concern its limitations. Much of the argument by counsel for Petitioners would lead one to believe that the Justices of our Appellate Court had determined that the `Act' was not only proof of the existence of the instrument (which it did), but was also proof that the instrument was a `fait accompli', (which it did not).
In the Court's view, the Petitioners will prevail only if the laws governing the efficacy of Donations Inter Vivos are *735 satisfied. Thus, this Court is compelled to decide which laws are applicable to the current state of facts. Ab initio this Court must decide what law to apply under the circumstances. The instrument was confected in Honduras, and by all the evidence before this Court complied with the laws of Honduras. While there was doubt on the part of this Court as to the validity of the document, all doubt has been swept away by the action of the Fourth Circuit Court of Appeals.

Succession of Jose Cipriano Velasquez-Bain (Cited supra)
Additionally, this Court recognizes that our Legislature has spoken positively on the subject and has expressed its will that Louisiana Courts accept `every attestation or authentication made by a commissioner, ... consul or vice-consul, as if the act was executed in this state.'
La.R.S. 35:555
However, Louisiana Revised Civil Code Article 10, provides in pertinent part:
`The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.
But the effect of acts passed in one country to have effect in another country is regulated by the laws of the country where such acts are to have effect...' This Court views this article as a mandate to apply Louisiana laws to the instrument now before the Court. Our Louisiana Civil Code provides in Article 1468: `A donation inter vivos is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it'. Assuming arguendo that the donor executed an instrument of donation and that the acceptance by Oscar A. Siri Zunga, on behalf of all of the other donees was a valid acceptance, the question must be addressed: Did the donor intend to make an irrevocable gift to the Petitioners? Our Courts have been frequently faced with the task of determining `donative intent'. Fundamental to our law governing `donations inter vivos' is the irrevocability of the gift. Our rule of law on this subject comes from the French who had adopted it from the `Codex Justinianus': Donner et retenio ne vaut!'To give and to keep is not valid.' Also, donatio non praesumitur!
IV. Irrevocability of Donations
No. 2592Plainol
Our Courts have declared that the substantive requirements of a divestment and donative intent must be fulfilled in order to effect a valid donation.

Broussard vs. Broussard (1976) La. Sup.Ct. 340 So.2d 1309 (Rehearing Denied1977)
This case as other cases decided by our highest appellate courts have held substance to be inviolate, while permitting the sanctity of form to be diminished.
See the rationale of:
Matter of the Succession of Dunham
408 So.2d 888 ([La].1981)

Primeaux vs. Lebersat [Libersat] (La. 1975) 322 So.2d 147
See also: `Donations Inter Vivos' 38 La. L.R. 397
This Court finds that the donation was in proper form and, more specifically, that this was an (attempted) donation inter vivos of an incorporeal right. Under our Civil Code, a certificate of deposit is an incorporeal movable and not subject to the rules for a manual gift.

Succession of Amos, 422 So.2d 605 ([La. App].1982)

Succession of Miller, 405 So.2d 812 (La. 1981)
But our Appellate Courts have consistently looked for those acts of the donor which indicate donative intent. Applying these principles to the case at bar, this Court finds that the actions of the late Mr. Velasquez-Bain to be demonstrative of one who retained the ownership of the funds on deposit in the Bank of New Orleans.
The (alleged) donor purportedly appeared before a notary and two witnesses on June 7, 1975. Subsequent thereto, Mr. Velasquez-Bain wrote more than a dozen *736 checks on his checking account in the Bank of New Orleans, which said account was obviously connected with his Certificate of Deposit. This Court is also impressed with the fact that the `donor' controlled the Certificate(s) of Deposit up to the time of his death. He `rolled-over' the certificates at their maturity. Respondents' Exhibit (D-17) shows clearly that the decedent drew down the interest earned and re-deposited the principal. During the course of the trial, no effort was made by the Petitioners to attack this important document. It is interesting to note that subsequent to Mr. Velasquez-Bain's death, the certificates rolled-over, including the interest. Banks, such as the Bank of New Orleans, have a policy to roll-over interest as well as principal, except when otherwise instructed. (See Exhibit D-17).
But of great significance to this Court is the fact that the alleged `donor' dealt with these funds in his Last Will and Testament, executed on December 6, 1976, as if he never made any donation to anyone. He specifically bequeathed these funds contrary to the provisions of the purported donation. (See the `Will' admitted to probate by Judge Oliver P. Carriere).
This Court concludes that the actions of the late Mr. Velasquez-Bain subsequent to June 7, 1975 treated these funds on deposit as his own because he never intended to make a donation inter vivos. As far as he was concerned, in our view, his intent was never to divest himself of approximately a quarter of a million dollars and he demonstrated this on numerous occasions by positive/willful acts, to wit:
1. Withdrawals/check writing.
2. Removal of funds from Whitney National Bank to the Bank of New Orleans.
3. `Roll-overs' of certificates in his name only.
4. Withdrawal of interest on certificates of deposit prior to roll-over.
5. Making of a will on October 6, 1976 and specifically making a donation mortis causa of the same funds which he allegedly made a gift (donation inter vivos) to others more than a year prior to his death.
Finally, although not deserving of as much attention, since this Court has concluded that the late Mr. Velasquez-Bain never intended to make a donation inter vivos, this Court was impressed with the testimony of the Respondents' handwriting expert. And while the Court does not specifically find that the signature on the purported donation was forgery, this Court did conclude, and there is ample evidence to support the conclusion, that subsequent to the creation of the document, that instrument was tampered with by someone.
The evidence is clear and uncontradicted that someone changed the language from `la Banca' to `el Banco'. This had to have occurred subsequent to the preparation of Exhibit D-3, an alleged photocopy. One cannot help but note that the altered original Spanish indicates that the donation was made of funds `la banca' (in the banking system) but the version pressed upon the Court, by Petitioners, indicates `el Banco de Nueva Orleans'the Bank of New Orleans. See P-1 which is the certified copy of the authentic act of donation. This Court compared that document with the alleged original Spanish in D-3 and D-5. The witness for Respondents, who impressed this Court with her knowledge of Spanish, was resolute in her opinion that `la Banca' and `el Banco' were significantly different. But this court was prone not to place faith in `photocopies' because there has never been produced a photocopy of the original act. Only that kind of proof would be proof positive that there was ever an instrument executed by Jose Cipriano Velasquez-Bain.
This Court was also cognizant of the transmittal to this Court by the Honorable Court of AppealsFourth Circuit, of documents submitted by the Consul General of Honduras. This court is impressed with the fact that counsel for the Petitioners made no effort to utilize any *737 of the information contained in the documents nor to urge this Court that the documents had any significance to these proceedings, whatsoever.
Judgment will be entered accordingly."

II. Facts
It should be initially noted that the facts of the case are radically in dispute as between the parties.
The will was filed in Civil District Court on December 15, 1977. A translation prepared and certified by Gloria Requina[4] of Professional Translators and Interpreters, Inc. was also filed.
The will was Instrument # 24 in the book of "Protocol"[5] of Jose Mauricio Larin, Notary Public of El Salvador, San Salvador. It recited that the testator was a 78-year old farmer residing and domiciled in El Salvador. It further stated as follows:
"...ONE: that he was born in the city of Sensuntepeque, department of Cabanas, of this Republic and is of Honduran nationality, the legitimate child of Cipriano Velasquez and Julia Bain de Velasquez, both deceased. TWO: that he has never been married. TERCERA: that he has no natural children to acknowledge as such. FOUR: that he has no debts of any kind. FIVE: that his patrimony is constituted by the following assets: a) several real estate properties located in different departments and locations of this Republic, covered by documents executed in his favor; b) deposits in savings accounts, at sight and on term, in Banks, Savings and credit institutions and corporations legally accredited in the Republic; c) credits in his favor executed in public *738 and private documents, by individuals and legally constituted Corporations this Country, arising from loans, unpaid balances for the sale of real estate, profit sharing agreements in coffee accounts and others; d) miscellaneous balances in his favor in checking accounts in Banks operating legally in this Republic; e) personal properties of various kinds, qualities and values, and one Bond of the Cooperativa Algodonera Salvadorena. SIX: that he institutes as his sole and universal heirs of all his transferable assets, rights and shares, present and future, to his nephews and nieces mister (sic) JULIO GUILLERMO NOLTENIUS VELASQUEZ, of legal age, a Civil Engineer, domiciled and resident in this city; Mrs. MARIA ADELA NOLTENIUS, of legal age, a Commercial Secretary, domiciled and resident in this city; Mrs. MARGOTH AIMEE NOLTENIUS de QUIROS, of legal age, a housewife, domiciled and resident in the city of San Miguel, department of the same naem (sic); Mrs. MARIA ALICIA NOLTENIUS DE VILANOVA, of legal age, a housewife, domiciled and resident in this city; and mister (sic) JOSE CIPRIANO NOLTENIUS VELASQUEZ, of legal age, an Employee, domiciled and resident in this city. SEVEN: that the five heirs named in the previous clause, are All Salvadoreans and the legitimate children of mister (sic) Federico Noltenius and Mrs. Maris Velasquez de Noltenius, the latter a legitimate sister of the grantor. EIGHT: that in the even (sic) of one or more of the heirs instituted, being unable or unwilling to accept the maker's heir, the remaining heirs named in this will shall be substituted, in like parts and in the event of a single one of the heirs being the acceptor of the inheritance, he shall be regarded as substitute of the others. NINE: that the maker does not formulate any legacies in this will, but wishes to leave on record that he has given private instructions to all the heirs instituted, to fulfill certain provisions of the makers not contained in this will, provisions which the appearer understands the instituted heirs will be bound to fulfill only as regards the moral aspect. TEN: That it is also the maker's will that if at the date of his death, there should be in his favor money deposits in Banks of the United States of North America, the instituted heirs abastain (sic) of disposing of said capital for a term of ten years and dispose only of the interest earned by such deposits.

That the maker understands that he cannot legally compel his heirs to comply with this clause, but the appearer wishes them to bind themselves morally. ELEVEN: that prior to this date ha (sic) has not formalized any testamente (sic) and any one that should turn up shall be regarded as revoked in all its parts by this one. I ATTEST: that the testator is of sound mind. Thus did the maker express himself, to whom I explained the legal effects of this instrument and having read it in full, in a loud voice, in a single act without interruption, in the presence of the able witnesses known to me, mister (sic) Humberto Portillo, who is fifty-eight years of age, a Driver, miss (sic) Clara Luz Espana Rodriguez, twenty-one years of age, a Student and mister (sic) Santos Francisco Valencia Rodriguez, thirty-six years of age, an Accountant, all three of them Salvadoreans, domiciled and resident in this city, persons who know the testator, whom they had in sight during the reading of this instrument, who heard and understood the tenor of its provisions and meet the special conditions required by the Law in this case of notarizing, the appearer clearly stated that is written according to his will, ratifies its content and we all sign. __I ATTEST. __Correction__CIPRIANO__Honduran__patrimony__Republic__private__Salvadoreans__meet__Valid. __Between lines__executed__Valid. Deletedf__d__y__Not Valid. More corrections: Driver__conten__Valid. __More between lines: Rodriguez__Rodriquez__Valid. __JOSE C. VELASQUEZ. __H. PORTILLO. __C.L. RODRIGUEZ. __S.F. VALENCIA R. __Before me M. MARTINEZ L. __Initialled."
(emphasis added).
*739 Also at issue are a series of documents[6] reputedly executed by the decedent on June 7, 1975 in the city of El Amatillo, Honduras before Jesus Ernesto Alvarado Lozano,[7] an attorney and Notary admitted to practice in Tegucigalpa, Honduras.
In Instrument # 3 the decedent is the sole appearer and the act is witnessed by "Santos Perez (Calix) and Gustavo Portillo, of legal age, bachelors, in the armed forces, residents of (the city of) Comayaguela" (Honduras). In Instrument # 3 the decedent recites that he is the heir and executor of his mother's succession, that his mother also named as heirs her daughter, Julia Margarita Zuniga, and grandson, Oscar Arturo Siri Zuniga, and that their bequests have not been paid to them. The act further recites:
"... SECOND: That fulfilling his duties, he hereby empowers ISABEL DE UNAMUNO DE SIRI, of legal age, married, interpreter, resident of Comayaguela, with a SPECIAL POWER OF ATTORNEY, so that on his behalf and in his stead she GIVE IN PAYMENT of the due bequests, the following personal property, whose value covers the principal, interests, and damages caused. In this manner: to JULIA MARGARITA ZUNIGA BAIN: 100,000.00 lempiras and 50,000.00 lempiras deposited respectively in BANCO ATLANTIDO S.A. and BANCO DE LONDRES Y MONTREAL LTDO., 120,000.00 lempiras and 133,000.00 lempiras invested respectively in the companies MOLINO CENTRAL HARINERO S.A. and MOLINO HARINERO SULA S.A.; to OSCAR ARTURO SIRI ZUNIGA: Real estate property registered in his favor under nos. 510, 511, 512, 513, in Folio 376 to 378 of Volume XVII of the Real Estate Property Register of the Department of Francisco Moranzan, and which he will acquire, registered today under No. 36, Folio 86 to 89 of Volume 225 of the same register. In addition, the balance of her accounts in the BANCO DE LONDRES Y MONTREAL LTDO. and BANCO ATLANTIDA S.A., as well as all the movable property and books found in her residence in Comayaguela, a vehicle, and a lot in the cemetery of said city where he will build a mausoleum. He is authorizing issuance of all public documents and transfer of all rights over said estate, whose ownership he relinquishes and power of attorney over. Thus stated and granted, ..."
In Instrument # 4 the decedent and Oscar Arturo Siri Zuniga on his own behalf and as agent for his mother Julia Margarita Zuniga Bain, were appearers and the witnesses were the same two as on Instrument # 3, Santos Perez Calix and Gustavo Portillo. Instrument # 4 provided:
"... both appearers Honduran and of legal age, who assured me of their right to exercise their civil rights, freely and spontaneously stated and granted: FIRST: JOSE CIPRIANO VELASQUEZ BAIN who is the owner of the following property: A) REAL ESTATE PROPERTY: 1) A lot in the corner of 4th Avenue and 5th Street of the city of Comayaguela, where there is an adobe house with curved tile roof ... property valued at 130,000.00 lempiras. 2) A lot, located in the corner of 4th Avenue and 5th Street of the city of Comayaguela ... house there made of adobe, with curved tile roof ... property valued at 50,000.00 lempiras. 3) An adobe house, with curved tile roof, ... located at a lot on 4th Avenue in Comayaguela ... property valued at 60,000.00 lempiras. 4) A house located at 4th Avenue in this city, built of adobe, curved tile roof ... property valued *740 at 60,000.00 lempiras. (He) declares that the related properties are registered in his name respectively, under No. 514, 515, 516 and 517, in folios 379 to 380 of Volume XVII of the Property Register of the Department of Francisco Moranzan, which he acquired through extrajudicial partiton from the inheritance of his father Cipriano Velasquez. 5) Certain rights over the property called San Jose del Rusio, in common with his sister Maria Julia Maximina Velasquez Noltenuis, widow, which belonged to Pedro Xatruch, located in the Retiro Valley, Department of Olancho, whose old boundaries were: to the North, the Guayape River; to the South, the mountain of the Jalan River; and to the East, the lands called Retiro Viejo, registered in favor of Cipriano Velasquez, in folios 119, 120 and 135 of Book No. 1 of the Curator of the Department of Olancho, not knowing the registered facts in his and his sister's favor in said common property; their inheritance valued at 50,000.00 lempiras, acquired by partition of the inheritance of their father Cipriano Velasquez. 6) An adobe house with curved tile roof, ... found in a lot located at 5th Street in Comayaguela ... valued at 120,000.00 lempiras ... 7) A lot located in Llano de Tonconto ... valued at 6,000.00 lempiras... 8) Lots in the Cemetery of Comayaguela which belonged to their father, not knowing the registered facts in their favor, valued at 5,000.00 lempiras. B) MORTGAGE CREDIT: 50,000.00 lempiras plus interest owed to him by Hermann Manuel Reichle Vijil, according to public instrument executed in Tegucigalpa on February 22, 1974 before Notary Public Armando Tome, under deed No. 50, guaranteeing said credit with a first and special mortgage over a property belonging to him, whose location, size and boundaries appear in No. 236, folios 480 to 482 of Volume 161 of the Property Register of the Department of Francisco Morazan, the lien being in favor of the declarer, under No. 273, folio 322 to 325 of Volume 245 of the mortgage Register of the same department. C) BANK DEPOSITS: US $250,000.00, deposited in the banking system of New Orleans, Louisiana, United States of America. D) INVESTMENTS IN COMPANIES: 7,500.00 and 5,000.00 lempiras in the Companies FOMENTO E. INVERSIONES S.A. of C.V. and COMPANIA EDITORA NACIONAL S.A., both of Tegucigalpa. E) REVENUES, DIVIDENDS, INTEREST, ETC.: That are in the custody of the ADMINISTRATION OF ESTATE No. 11 OF JOSE C. VELASQUEZ in the Fiduciary Department of the Banco Atlantida S.A. SECOND: JOSE CIPRIANO VELASQUEZ BAIN grants hereby all the previously described property, GIVING THEM INTER VIVO, PERPETUALLY AND IRREVOCABLY AND JOINTLY to the following persons, in the following amounts: 1) JULIA MARGARITA ZUNIGA BAIN, 15% 2) MARTHA VELASQUEZ DE DIAZ BUSTAMANTE, 15%; 3) ADRIANA SIRI DE LOPEZ AND MARIA REGINA SIRI DE REYES, 15% between them in equal parts; 4) JUDITH VELASQUEZ DE BOGRAN, 10%; 5) OSCAR SIRI ZUNIGA, 10%; 6) SANTOS FRANCISCO VALENCIA, 7½%; 7) CARLOS WILFREDO CRUZ MEJIA, 7½% 8) CHILDREN OF ENRIQUE AND RAFAEL CARDONA, 5% divided between all of them; 9) COLONEL LENIN O'CONNOR BAIN, 5%; 10) HERMINIA TURCIOS REINA, 2½% 11) VICTORIANO CRUZ LOZANO, 2½%; 12) HONDURAN WHITE CROSS: OLD AGE HOME, 2½%; 13) INTERAMERICAN ROUND TABLE, TEGUCIGALPA SECTION, 2½%. He states that the effects of this donation are suspended until fulfillment of the following conditions: a) Seeing his nieces Martha Velasquez de Diaz Bustamante and Judith Velasque de Bogran; b) that his nephew Oscar Arturo Siri Zuniga remain in Honduras for more than a year, even if it is in a discontinued manner; c) that the wife of the latter, Isabel de Unamuno di Siri give birth to a child in Honduras, and that said lady start the procedures for Honduran citizenship, and, that their child be *741 named Jose or Josefina among other names; d) that the registered facts be known about his rights over the land in San Jose del Rusio and the plots in the Cemetary of Comayaguela, e) that the donees in Honduras get together to decide about their common property, executing a document that the other appearer will draw up, whereby they will ratify of (sic) reject this instrument. He declares that he appoints the other appearer as executor, in his case, granting accretion rights to the other donees who remain faithful to its dispositions and who defend the donated common property, according to the amounts assigned, accreting from those who reject it or whose actions run against the joint majority interest. THIRD: OSCAR ARTURO SIRI ZUNIGA, ACCEPTS THE INTER VIVO LEGACY PERPETUALLY AND IRREVOCABLY made to his constituent and to himself in the terms herein, acceptance which he applies to the whole legacy, since it is a joint legacy, offering his sincere thanks; that he accepts the appointment as executor, which he vows under oath to fulfill faithfully. FOURTH: JOSE CIPRIANO VELASQUEZ BAIN asks the other appearer, witnesses and the Notary to keep absolute secrecy about this document until fulfillment of the first 4 (a, b, c, d) indicated suspensive conditions, and instructs the Notary not to release any copy of this document until all its conditions are fulfilled, which he, or a competent authority, must verify. So stated and executed before witnesses Santos Perez and Gustavo Portillo, both of legal age, bachelors, in the armed forces, residents of Comayaguela. This instrument was ratified by the grantors after reading it in its entirety, and was signed together with the witnesses. To all of which, to the knowledge, state, age, profession, and residence of all, having before me the general power of attorney granted to the appearer Siri Zuniga, before Notary public Jose Cisne Reyes,..."
In Instrument # 5, the decedent was the sole appearer and the witnesses were the same two as in Instruments # 3 and # 4, Santos Perez Calix and Gustavo Portillo. Instrument # 5 states:
"... appeared JOSE CIPRIANO VELASQUEZ BAIN, ... who ... states: that he grants SPECIAL POWER OF ATTORNEY to attorney OSCAR SIRI ZUNIGA, of legal age, married, resident of Comayaguela, to REVOKE the GENERAL POWERS OF ADMINISTRATION OF HIS PROPERTY AND FOR LAWSUITS which maybe granted in the future, as well as that of a constitute TRUST, when in the execution of said powers his agents or trustees abuse their attributions; empowering him to perform the necessary procedures and to execute the corresponding public documents. Thus stated and granted, witnessed by..."
Instrument # 6 is the last document in the series reputedly executed that day before Jesus Ernesto Alvarado Lozano by the decedent. Unlike the previous documents, Instrument # 6 has two new witnesses:
"... before the witnesses to this instrument, SANTOS FRANCISCO VALENCIA, Salvadoran, bookkeeper, resident of San Salvador, Republic of El Salvador, and CARLOS WILFREDO CRUZ MEJIA, Honduran, banker, resident of Tegucigalpa, Central District, both of legal age and married..."
Instrument # 6 provides:
"... personally appeared JOSE CIPRIANO VELASQUEZ BAIN, Honduran, of legal age, a bachelor, farmer, resident of San Salvador, Republic of El Salvador, and temporarily of this jurisdiction, who assured me of his right to exercise his civil rights, freely and spontaneously states: that hereby he grants general power of attorney to BANCO ATLANTIDA S.A., of Tegucigalpa, Central District, to represent the declarer in all matters where it may have a direct or indirect interest, thereby granting the following power: to administrate all his movable and inmovable (sic) property, to *742 execute all sorts of contracts, to execute public and private documents, to mortgage or pledge all property and real rights of the declarer, to settle any disagreements, as well as to execute any act of strict ownership without any reservations or limitations, to accept, release, collect, protest and endorse bills of exchange, checks, promissory notes and any other securities; to receive dividends and interests for any kind of securities, to obtain loans and cancell (sic) mortgages; to represent him before any official, governmental, administrative and judicial authorities, and before private corporations and individuals, for which it is vested with the general and special powers of the power of attorney, as well as the following: to sue, contest suits, counterclaim, accept the opposing party's suit, abandon the suit at first instance, waive legal deadlines and remedies, to compromise, to empower the arbitrators with arbitrating powers, to receive, to settle, to confer special powers and revoke them, to pay amounts of money the grantor may owe, all without any limitation, and he shall give his agent, BANCO ATLANTIDA S.A., instructions for what is not provided for herein, through a simple letter; to execute sale or mortgage contracts, it will be necessary to get instructions from the grantor, JOSE CIPRIANO VELASQUEZ BAIN, in writing, through a simple letter. BANCO ATLANTIDA S.A., as agent, can renounce this power of attorney whenever it may find it convenient, in which case it should advise the grantor of such a decision one month in advance. Thus stated and granted, ..."
Considerable dispute as to the facts surrounding the execution of "Instruments #3, 4, 5, 6" were revealed during trial.
Captain Manuel de Jesus Valladares of Honduras was admitted as an expert on forgery and was called as a fact witness by the heirs. Captain Valladares has served as a member of the National Honduras Police Force since 1963 and presently teaches at the National Academy. He wrote the manuals used to teach handwriting analysis at that institution.
He has studied in Costa Rica and Chile, as well as at the International Police Academy in Washington, D.C. He has also completed courses in Honduras taught by U.S. Technical Advisors through the U.S. Agency for International Development.
Captain Valladares examined the original "Instruments # 3-6" contained in the bound book of Protocol belonging to the Notary, Jesus Ernesto Alvarado Lozano, on two occasions. He examined them once when Jose Francisco Zacapa, the attorney representing the heirs in the succession proceedings in Honduras, requested an expert examination and once when Captain Valladares was requested to do an expert examination by the Supreme Court of Justice of Honduras in conjunction with a criminal investigation of this case in that country.
The first time Captain Valladares, accompanied by a Justice of the Honduran court, attempted to take custody of the documents, they were informed that the Notary had gone into hiding. The second time, the Protocol book was presented to Captain Valladares by Roberto Zacapa, an attorney and the brother of the attorney representing the heirs. Mr. Valladares compared the signatures on the Protocol against Mr. Velasquez-Bain's signature on a number of checks and the signature registration card on file at the Banco Atlantida, S.A. Captain Valladares concluded that the signature on Instrument # 6, the power of attorney to Banco Atlantida, was authentic but that the signatures on the other three documents were forgeries produced by tracing the signature from the last document onto the other three. It should be noted that the two witnesses on the last document, # 6, are different people than the two witnesses on the other three documents, although all of the documents were reputedly executed on the same day. The signatures from all four documents along with Captain Valladares opinion as to each are reproduced below:
*743 *744 The donees also presented an expert, who found that all four signatures were genuine. His only credential was from the "Institute of Identification", a membership organization which gives no tests and does no training. The trial judge stated that he found Valladares the more credible witness.
The two witnesses on Instrument # 6 are Santos Francisco Valencia and Carlos Wilfredo Cruz Mejia. Both Mr. Cruz and Mr. Valencia were listed as donees with an interest of 7½% respectively. On February 23, 1978, Mr. Valencia appeared before Notary Rene Salomon Portillo[8] and executed the following affidavit:
"I was surprised to learn that the lawyers... have filed in my name together with other persons, a civil suit at the Court of the District of Orleans, identified as No. 77-18538, Division H, Docket No. 1, directed at contesting the will executed by mister Jose Cipriano Velasquez Bain, who was of legal age, an Agriculturist, domiciled in this city of San Salvador and to make my position quite clear, I make the following statement under oath: that I have not commissioned nor executed any power-of-attorney whatever to said lawyers ..., to represent me at the Court of New Orleans, because I was precisely one of the witnesses to the above mentioned will, which I can attest that was executed in accordance with the laws of the Republic of El Salvador, therefor, I disavow them to act in my name; furthermore, on the date which the aforementioned lawyers as having been the date when the donation of June seventh, 1975 was made, in the Republic of Honduras, before the Notary Jesus Ernesto Alvarado Lozano, I know for a fact that mister Cipriano Velasquez Bain was in the Republic of El Salvador, that such donation is false because it was not executed by the late mister Jose Cipriano Velasquez Bain, either in my favor or in favor of anyone else, because in the event of his having done so, I would have known about it immediately to cancel the accounts in the books I kept for the New Orleans Banks.
I trust you will present this letter to the Court at which the suit has been filed, in order to disavow the claims made by these lawyers in my name."
Santos Francisco Valencia was the decedent's accountant.
The second witness to Instrument # 6, Carlos Wilfredo Cruz Mejia, was also a "donee" with 7½% interest under the purported act of donation. Valencia's affidavit, quoted above, was executed on February 23, 1978. On November 1, 1980, Mr. Valencia reputedly sold his 7½% interest in the various properties to Carlos Wilfredo Cruz Mejia for 32,450 Lempiras by a notarial act before Humberto Alfonso A. Pinto Rodriguez. The witnesses to the sale were "Rafael Evangelista de Murillo y Barralaga, domiciled in Comayaguela, Central District, (Honduras) and Clara Luz Espana Pinto,[9] of the same domicile both single, age of majority and office workers ..." Not surprisingly, Santos Francisco Valencia did not testify at the trial.
Mr. Valencia's comment relative to "... cancel(ing) the accounts in the books I kept for the New Orleans Banks" is, however, significant in light of two other facts.
The first fact deals with three copies introduced into evidence as Opposition 1 (Opposition to Probate or P-1)[10] by the donees, and D-3 and D-5 by the heirs.
D-3 contains a notary attestation clause stating that it is a xerox copy made from the original in Lozano's bound Protocol book and is dated April 4, 1978. The attached *745 certification from U.S. Consul Annette L. Veler is dated April 5, 1978. Indeed the curve of the paper on the left side where it is bound is apparent on the photocopy. Additionally, it contains the reputed signatures of the decedent and witnesses. As discussed in Footnote 5, above, only the original document contained in the notary's book of Protocol will ever have any signatures. D-3 is reproduced below for visual inspection:
 The notary's attestation clause on P-1 states that this particular copy was made on Thursday, February 6, 1980. P-1 the "First Copy", contains no signatures. The attached certification from U.S. Consul William H. Barkell is also dated February 6, 1980. The pertinent part of P-1 is reproduced below:
 D-5 contains an attestation clause signed by the Notary who passed the Act, Jesus Ernesto Alvardo Lozano, stating that it is a photocopy which is a true and exact copy of *746 the original writings # 3, 4, 5, and 6 as they appear in his bound Protocol of writings published in the year 1975. The attestation clause is dated June 16, 1982 and the attached certification from U.S. Vice-Consul George A. Flowers, Jr. is dated June 17, 1982. The pertinent part of D-5 is reproduced below:
 Thus D-3 dated 1978 and D-5 dated 1982 read "depositados en la Banca de Neuva Orleans, Louisiana, Estados Unidos de America," whereas P-1 dated 1980 reads "depositados en el Banco de Nueva Orleans, Louisiana, Estados Unidos de America.", with "el" and the letter "o" raised above the line of the type.
Gloria Requina testified that the change in the language from "la Banca" to "el Banco" changed the meaning from "in the banking system" to "in the Bank of New Orleans." This first set of facts, combined with Mr. Valencia's affidavit, is significant in light of the actions taken by the decedent.
The Act of Donation was reputedly passed on June 7, 1975. At that time, one of the decedent's Certificates of Deposit was with the Whitney Bank. On December 10, 1975, six months after the Act was passed, the decedent wrote to Whitney requesting that the C.D. be transferred to the Bank of New Orleans. (D-18). On December 17, 1975, B.N.O., now in receipt of the funds, issued C.D. # 32768 (D-17), which was "rolled-over" seven times prior to his death. Despite the reputed "Act of Donation", the decedent continued to retain control over the C.D.'s by using interest, reinvesting, and changing banks. A second C.D. was also "rolled-over" seven times after the Act and a third C.D., purchased 14 months after the Act was "rolled over" at least three times.
Lastly, the testimony concerning what happened on the day that the "Act of Donation" was passed is as fascinating as it is incredulous. As is apparent from the signatures reproduced above, and as per the testimony of Oscar Siri-Zuniga, Instruments # 3, 4, and 5 were typed on a different typewriter than Instrument # 6.
The "donees" led principally by Oscar Siri-Zuniga contend that on June 7, 1975, Mr. Velasquez-Bain traveled from El Salvadore and into Honduras to El Amatillo, a border town.
Santos Perez Calix, witness to Instruments #3, 4, and 5 and an administrator and business manager employed by Oscar Siri-Zuniga, testified that Mr. Siri-Zuniga's mother's driver picked up both him and Jesus Ernesto Alvarado Lozano, the Notary on the Act of Donation who was also an employee of Oscar Siri-Zuniga's, and drove them to El Amatillo, Honduras. He testified that they met at a house in the neighborhood of the media area of the Honduras *747 Custom's Office, approximately 30 steps away from the Customs Office. He testified that they met at noon and that all of the documents were signed and completed at 2:00 p.m., with the decedent dictating the documents word by word to the Notary who typed all 4, read them back in toto before the witnesses and completed all signatures in those 2 hours. Mr. Perez Calix testified that 4 people were there plus himself: Notary Jesus Ernesto Alvarado Lozano, Oscar Siri-Zuniga, decedent Jose Cipriano Velasquez-Bain, and Carlos Wilfredo Cruz Mejia. On re-cross he further testified that he did not know Santos Perez Valencia until he was introduced to him that day, but the witness did not initially testify that Valencia was present. Mr. Perez Calix further testified that he did not know the decedent until Oscar Siri-Zuniga introduced him that day.
Calix was present as a witness at the request of Notary Lozano. He had witnessed other documents before for Lozano, but never outside of Lozano's office. Calix stated that Lozano brought two typewriters to the scene, but that only one was used. He further testified that the other typewriter remained in the car the entire time and was never used.
Like Santos Perez Calix, Carlos Wilfredo Cruz Mejia, a "donee" under the act and the man who purchased Santos Francisco Valencia's 7½%, testified that he traveled to El Amatillo, Honduras on June 7, 1975. Unlike Mr. Calix, however, Mr. Cruz Mejia testified that 5 people were there plus himself: the decedent, Notary Lozano, Oscar Siri-Zuniga, Gustavo Portillo, and Santos Francisco Valencia. Mr. Cruz Mejia was an employee of Banco Atlantida (Instrument # 6Power of Attorney to that Bank) for 9 years and of Banco Casa for 15 years. He also testified that the decedent was his godfather. He testified that he was only personally involved (i.e. signed) in one transactionthe power of attorney to Banco Attantida, but he was present or nearby during the signing of Instruments # 3, 4, and 5 as well. Mr. Cruz Mejia testified that all of the participants left together and that the Notary left with all of the documents "carrying them alone" and indicated that the documents were tucked under Lozano's left arm.[11]
Mr. Cruz Mejia further stated that after the documents were signed, on June 7, 1975, he crossed the border from Honduras and into El Salvador and that he spent approximately 8 days thereafter at the decedent's home in El Salvador. He stated that he crossed the border from Honduras (his residence) and into El Salvadore with Mr. Velasquez-Bain, Mr. Valencia, and Oscar Siri-Zuniga. Lastly, he stated that he was present at the Notarial Acts at the decedent's request.
Oscar Siri-Zuniga, a "donee" entitled to 10% under the Act testified that Adrianna Siri De Lopez Y Maria Regina Siri De Reyes (15%) was his sister, that Julia Margarita Zuniga Bain (15%) was his mother and employer of the driver who brought Notary Lozano and Mr. Perez Calix to El Amatillo. The decedent was Siri-Zuniga's uncle. Mr. Siri-Zuniga testified that 6 people were present plus himself: Jose Cipriano Velasquez-Bain, Mr. Portillo, Mr. Perez Calix, Mr. Cruz Mejia, Mr. Valencia, and Notary Lozano. Unlike Mr. Calix's testimony, Siri-Zuniga stated that the notary switched typewriters. Also unlike Calix's testimony, Siri-Zuniga stated that at the completion of signing Notary Lozano put all the documents in a briefcase. When questioned about the extra witnesses, Mr. Siri-Zuniga stated that "Nobody brought them ..., they came because they wanted to come there."[12] He later stated, however, that he helped provide transportation via his mother's vehicle when the notary and witness needed transportation.
Mr. Siri-Zuniga was positive about the fact that he crossed the border into El Salvador on June 7, 1975. He specifically remembered the day because he knew it was the same day that the documents were executed.
*748 Alfredo Humann Cordon is the Assistant Delegate with the Customs & Immigration Office of Honduras at El Amatillo. He testified that he checked the Immigration Records of Honduras at the El Amatillo post and found that Mr. Cruz Mejia and Oscar Siri-Zuniga crossed from Honduras into El Salvador 10 days prior to June 7, 1975, the date of the acts. Both gentlemen returned from El Salvador and re-entered Honduras between June 10th and June 18th of 1975. Mr. Cordon further testified that based on his personal inspection of the records Jose Cipriano Valasquez-Bain did not cross the border during the month of June, 1975. According to the donees testimony, Jose Cipriano Velasquez-Bain would had to have crossed the border at least once (when they accompanied him across the border immediately after signing the documents) and probably would have to have crossed it twice (coming from his residence in El Salvadore to El Amatillo, Honduras). When confronted with Cordon's testimony that he crossed the border the day before the Act, Siri-Zuniga replied that Cordon's testimony was inaccurate.

III. Errors on Appeal
On appeal, the "donees" raise the following specifications of error:
"A. The Trial Judge erred in holding that Jose Cipriano Velasquez-Bain `never donated to the petitioners the Certificate of Deposit or Certificates of Deposit, the legal ownership of which constitutes the gravamen of the dispute between the parties and the basis of this action.'
B. The Trial Judge erred in holding that the Court of Appeal, in its judgment rendered on June 8, 1982, merely held that the authentic Act of Donation presented by Plaintiffs-Appellants was proof of the existence of the document, but was not proof of the donation as such.
C. The Trial Judge erred in holding that, despite the recognization by the Court of Appeal of the validity of the authentic Act of Donation, the Trial Judge was authorized to inquire into the question of `donative intent'.
D. The Trial Judge erred in holding, contrary to the holding of the Court of Appeal, that the certified and authenticated copy of the donation inter vivos was not sufficient proof of the existence of the donation inter vivos.
E. The Trial Judge erred in disregarding the mandate of the Court of Appeal remanding the case solely for the purpose of trying the issue of forgery and deciding the case on the basis of lack of `donative intent.'
F. The Trial Judge erred in attempting to repudiate or to overrule the holding of the Court of Appeal to the effect that:
`... It is up to the parties alleging the forgery to prove by whatever means necessary the existence of the allegations, since the certified and authenticated copy as presented, absent such allegation, is sufficient proof of the existence of the donation inter vivos.'

G. The Trial Judge erred in deciding the case on the issue of `donative intent', when the donation was effected by an authentic Act of Donation.
H. The Trial Judge erred in dismissing Plaintiffs-Appellants' suit on the grounds that the donor never intended to make a donation inter vivos.
I. The Trial Judge erred in dismissing Plaintiffs-Appellants' suit for lack of `donative intent', when that issue was not raised by Defendants-Appellees, either in their pleadings, or in their presentation of evidence.
J. The Trial Judge erred in using evidence admitted soley for the purpose of showing forgery, to conclude that there was an absence of a `donative intent'.
K. The Trial Judge erred in not concluding that there was no forgery and in not rendering Judgment in favor of Plaintiffs-Appellants."
(Donee's Brief, p. 3-4).
In reality, those specifications of error state only four issues:
1. Whether the trial court erred in its finding that the decedent "never donated to the petitioners the Certificate of Deposit or Certificates of Deposit ..."
*749 2. Whether the trial court erred in considering the question of the validity of the act in light of this Court's prior ruling?
3. Whether the trial court erred in considering "donative intent"?
4. Whether the trial court erred "in not concluding that there was no forgery and in not rendering Judgment in favor of (the donees)"?

IV. Choice of Law
Civil Code Article 10 formerly provided as follows:
"The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.
But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect. The exception made in the second paragraph of this article does not hold, when a citizen of another State of the Union, or a citizen or subject of a foreign State or country, disposes by will or testament, or by any other act causa mortis made out of this State, of his movable property situated in this State, if at the time of making said will or testament, or any other act causa mortis, and at the time of his death, he resides and is domiciliated out of this State."
Thus on the face of the statute, it is apparent that the form and substance of the will as it relates to movables is adjudged under the laws of the nation of San Salvador (Paragraph 3, supra), whereas the substance of the donation inter vivos is adjudged under the laws of the State of Louisiana (Paragraph 2, supra). As would be expected, the caselaw and later statutory enactments follows the distinction created by C.C. Art. 10.[13]
In Tillman v. Mosely, 14 La.Ann. 710 (Monroe, 1859), the court found that an act of donation written and signed in Alabama was intended to have effect in Louisiana and thus was required to comply with the laws of Louisiana under C.C. Art. 10. The court further found:
"Neither is this donation clothed with the formalities required by Articles 1523 and 1529 of the Civil Code, to give it validity, and to make it binding upon the donor, in Louisiana.
Lastly, it is bad, under the Article 1520 of the Code, because the usufruct of the property donated, is reserved to the donor. [Carmouche v. Carmouche] 12 An. 721; [Haggerty v. Corri] 5 An.433; [Dawson v. Holbert] 4 An. 36."
At 710.
The holding in Tillman, although enunciated 126 years ago is still good law. See: Bland v. Lloyd, 24 La.Ann.603 (New Orleans, 1872); Succession of Sinnott v. Hibernia National Bank, 105 La.705, 30 So. 233 (1901); Creech v. Errington, 207 La.615, 21 So.2d 761 (1945); Almond v. Adams, 221 La.234, 59 So.2d 132 (1952).
In the period from 1979 through 1983, C.C. Art. 10 was amended twice[14] to read as follows:
"The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.
But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect. The exception made in the second paragraph of this Article does not hold, when a citizen of another state of the union, or a citizen or subject of a foreign state or country, disposes by will or testament, or by any other act causa mortis made out of this state, of his movable property situated in this state, if at the time of making said will or testament, or any other act causa mortis, and at the time of his *750 death, he resides and is domiciliated out of this state.
Immovables situated in this state, with their accessories, acquired by a married person, are subject to the legal regime of acquets and gains regardless of his domicile. Movables, wherever situated, are subject to the law of the domicile of the acquiring spouse.
Persons who reside out of the state, cannot dispose of the property they possess here, in a manner different from that prescribed by the laws of this state. This prescription provided by the laws of this state applies to an obligation arising under the laws of another jurisdiction which is sought to be enforced in this state. When a contract or obligation has been entered into between persons who reside out of this state, which is to be paid or performed out of this state, and such contract or obligation is barred by prescription, or the statute of limitations, of the place where it is to be paid or performed, it shall be considered and held to be barred by prescription in this state, upon the debtor who is thus discharged coming into this state."
As the decedent was never married and no issue of prescription is present here, the former and current C.C. Art. 10 are essentially the same, with the new paragraph 5 being merely a reiteration of the holdings of numerous cases cited above.
Accordingly, the trial court acted properly in finding that the laws of the State of Louisiana control.

V. Specification of Error # 2
Initially turning to the donees second argument, we note that counsel for the donee repeatedly objected whenever the heirs sought to introduce evidence or testimony of forgery challenging the validity of the purported Act of Donation, citing Velasquez I.
The donees argued that Velasquez I held that the Consul certified Protocol was absolute proof as to the existence, validity of form, validity of substance, and authenticity of that document.[15] That was not the holding in Velasquez I. If the court had so found, then it would have entered a Declaratory Judgment. Instead the court remanded the matter for a hearing and the taking of evidence on the questions of fraud and forgery. Thus the trial court did not err in considering the question of the validity of the Act.

VI. Specifications of Error # 4
A "judgment" and "reasons for judgment" are two separate and distinct legal documents. C.C.P. Article 1918 provides:
"A final judgment shall be identified as such by appropriate language. When written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment."
Appeals are taken from a "judgment", not from "written reasons for judgment."
"An appeal may be taken from a final judgment rendered in causes in which appeals are given by law ..."
C.C.P. Art. 2083 (emphasis supplied).
In Hinchman v. International Bro. of Elec. W., L.U. #130, 292 So.2d 717, 719 (La., 1974) on remand 299 So.2d 818 (La. App.1974), writ denied 302 So.2d 618, cert. denied 421 U.S. 950 95 S.Ct. 1683, 44 L.Ed.2d 104, the Supreme Court discussed the difference between a judgment and written reasons for judgment:
"Article 1918 C.C.P. was enacted to suppress confusion and to prevent the recording of lengthy opinions.[16] 35 Tul.L. *751 Rev. 578, 583 (1961). It was also adopted to avoid the problem presented in Anderson v. Nugent, 16 So.2d 282 (La.App. 2d Cir.1944), and thereby insure that the contested subject matter is definitively disposed of by decree ... The object of C.C.P. 1918 was to distinguish between an opinion and a judgment in the trial court, and to separate the two."
(footnote added).
So basic is the distinction between judgments and written reasons for judgment that in Bordelon v. Dauzat, 389 So.2d 820 (La.App. 3rd, 1980) the Third Circuit held where a trial judge initially issued written reasons for judgment rejecting plaintiffs demand, one month later issued written reasons for judgment accepting plaintiff's demand and three days later issued judgment in favor of plaintiff, that where there are only written reasons and no separate signed judgment, there is no final judgment. The court in Dauzat stated:
"This argument has no merit. It ignores the fundamental distinction between the written reasons and the final judgment. LSA-C.C.P. Articles 1911 and 1918 provide:
`Art. 1911. Final judgments read and signed in open court
`Except as otherwise provided by law, all final judgments shall be read and signed by the judge in open court.'
`Art. 1918. Form of final judgment
`A final judgment shall be identified as such by appropriate language. When written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment."
The jurisprudence under these articles uniformly holds that where there are only written reasons and no separate signed judgment, there is no final judgment. Fisher v. Rollins, 231 La. 252, 91 So.2d 28 (1956); Pearce v. Johnson, 250 So.2d 567 ([La.App.]. 3rd Cir.1971).
Prior to final judgment, a trial judge may, at his discretion, change the substance of the result of interlocutory rulings. Labourdette v. Doullut and Williams Shipbuilding Co., 156 La. 412, 100 So. 547 (1924); Arnold v. Stupp Corporation, 249 So.2d 276 ([La.App.]. 2nd Cir. 1971); Grady v. Allstate Insurance Co., 355 So.2d 1070 ([La.App.]. 4th Cir.1978); Jarvis v. Lafayette General Hospital, 373 So.2d 1000 ([La.App.]. 3rd Cir.1979), on remand 379 So.2d 1179 ([La.App.]. 3rd Cir.1980). A trial judge may also sign a judgment based on written reasons which differ substantially from previously stated oral reasons. Margan v. Precision Motors, Inc., 317 So.2d 664 ([La.App.]. 4th Cir.1975)."
On appeal, this court reviews judgmentsnot "cases" or "reasons for judgment"and it generally reviews one particular judgment, namely the judgment specified on the trial judge's order granting a motion for appeal. Thus on appeal, this court examines the result of that judgment, not the reason why the trial court reached that result, because this court may not substitute its own views on the credibility of witnesses in the absence of manifest error. Accordingly, where this court believes that the trial court reached the proper result, the judgment will be affirmed even though this court may disagree with some aspects of the trial judge's views on credibility.
With those thoughts in mind, we return to the donees contention that the trial court erred "in not concluding that there was no forgery." The trial judge came one parsec away from finding a forgery.[17] In light of the exhaustive evidence reviewed above, with special emphasis upon Capt. Valladare's testimony indicating forgery, Immigration Officer Cardon's testimony that the decedent did not cross the border and most significantly, the changed language on the First Copy so *752 that it would conform with acts taken by testator after the purported Act was passed, we are of the belief that a forgery did in fact occur. Since such a finding would not change the judgment, however, any error which may have been committed is merely "harmless error".

VII. Specification of Error # 3 and # 1
Having found the purported act to be a forgery, we need not address further specifications of error raised by the "donees".

VIII. FNBC's Request
First National Bank of Commerce, as the result of a merger between itself and the Bank of New Orleans, now holds the funds. FNBC as the successor-in-merger to B.N.O. made the following request both in its appellate brief and at the trial court level:
"First National Bank of Commerce, therefore, respectfully requests that in any decision reached by this Court there be a specific provision directing to whom First National Bank of Commerce should remit the proceeds of the subject certificates of deposit, upon the finality of any such decision. The undersigned further states that other counsel have indicated that they are in agreement with the request made hereby and that specific direction to First National Bank of Commerce by this Court will expedite the ultimate disposition in this matter."
Indeed, this request is in accordance with a stipulation agreed to by all parties.
For the reasons discussed, the judgment of the district court is amended as follows and as amended, is affirmed:
"IT IS ORDERED, ADJUDGED AND DECREED that there by judgment herein in favor of Respondents, JULIO GUILLERMO NOLTENIUS, MARIA ADELA NOLTENIUS, MARGOTH AIMEE NOLTENIUS DE QUIROS, MARIA ALICIA NOLTENIUS DE VILANOVA, JOSE CIPRIANO NOLTENIUS, and against Petitioners, JULIA MARGARITA ZUNIGA BAIN, MARTHA VELASQUEZ DE DIAZ BUSTAMENTE, ADRIANA SIRI DE LOPEZ Y MARIA REGINA SIRI DE REYES, JUDITH VELASQUEZ DE BOGRAN, OSCAR SIRI ZUNIGA, SANTOS FRANCISCO VALENCIA, CARLOS WILFREDO CRUZ MEJIA, HIJOS DE ENRIQUE Y RAFAEL CARDONA, CORONEL LENIN O'CONNOR BAIN, HERMINIA TURCIOS REINA, VICTORIANO CRUZ LOZANO, CRUZ BLANCA HONDURENA, ASILO DE ANCIA NOS, and MESA REDONDA PANAMERICANA SECCION DE TEGUCIGALPA, dismissing the action of Petitioners, with prejudice, and at their costs.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the First National Bank of Commerce, as successor-in-merger to the Bank of New Orleans and Trust Company, remit the proceeds of the subject certificates of deposit upon the finality of judgment to the Respondents, Julio Guillermo Noltenius, Maria Adela Noltenius, Margoth Aimee Noltenius de Quiros, Maria Alicia Noltenius de Vilanova, and Jose Cipriano Noltenius."
AMENDED AND AFFIRMED.
NOTES
[1] Loosely translated as the "Pan American Round Table, Section of the City of Tegucigalpa" (Honduras).
[2] The petition also alleged that the will executed one month before the decedent's death was invalid under El Salvadore law because (1) one witness was a woman, (2) the will did not contain the addresses of the decedent, Notary and witnesses, and (3) the testator's nationality and birthplace were not stated.
[3] There is no evidence indicating whether or not Consul Reyes is related to Adriana ... Reyes, a donee with 15% interest under the act or Jose... Reyes, another notary involved.
[4] Miss Requina a native of Bolivia and a U.S. citizen has been employed as a translator for 20 years. She has 4 years of college and Certifications in simultaneous interpreting from the U.S. State Department, after training in Washington, D.C. She was hired as both a translator and interpreter by counsel for the Noltenius heirs. She was admitted as an expert in the case and translated the testimony of Spanish speaking witnesses for most, but not all, of the trial.

Counsel for the donees also hired an interpreter for these proceedings, Mr. Mariano W. Guas. Mr. Guas was a native of Havana, Cuba where he attended De La Salle for primary and secondary school. He left Cuba at the age of 19 to attend Tulane Law School from which he graduated in 1938. He then attended Havana University where he obtained an L.L.B. and Doctorate degree in Law. Mr. Guas practiced law in Cuba for 25 years, leaving in 1962 during the Castro takeover. Mr. Guas has been admitted as a translator in both Federal and State courts and was admitted as an expert in this case. He has not been admitted to the Louisiana Bar because he is not a U.S. citizen. Mr. Guas translated part of the trial and was at the counsel table throughout the rest of the trial in order to contest translations if necessary.
[5] The word "protocol" has two usages in the record. The first word usage refers to a book of bound notarial acts. The acts are bound annually and are numbered consecutively as "Instrument # 1, # 2, # 3," etc. See: Honduran Notarial Code, Art. Number 13. The second word usage of "Protocol" refers to the individual document which is actually contained in the book as distinguished from any reproduction or other facsimile thereof. When a notarial act is passed in Honduras, the original is signed by the parties, notary, and witnesses and is retained exclusively by the notary. This original or "Protocol" is bound by the notary in his book of Protocol. The party executing the act, be he testator, affiant, or donor, is then given what is known as the "First Copy". The "First Copy" is typed or handwritten word-by-word from the original contained in the Protocol. The "First Copy" contains no signatures. Upon request, the Notary can issue other hand or typewritten word-by-word signatureless "copies" from the original document, but notations as to the date, issuance, and party must be made in the margins of the original contained in his Protocol. Thus only the notary will have any document with signatures contained thereon.

The "First Copy" and other facsimilies produced by the Notary as per the above described procedure raises under Honduran law a "presumption of proof" similar to that of "Certified Copies" under our law. Just as uncertified photocopies are inadmissible as presumptive proof in our courts, so "copies" which do not conform to the "certification" method, i.e. typed or handwritten word-by-word from the Protocol, are inadmissible as presumptive proof in Honduran courts.
Finally, it appears that one basis for the Honduran rule of evidence is directly related to the paper on which "Protocols" and "First Copies" must be written. The paper is owned and sold only by the Honduran government. Each sheet is numbered serially and sold in lots exclusively by the Honduran government. Additionally, each sheet of paper is subject to a Honduran tax.
[6] Quotes and discussions refer to translations of Instruments # 3, 4, 5, and 6 provided by Gloria Requena on June 30, 1982 (Exhibit D-6) except where expressly noted.
[7] There is no evidence indicating whether or not the Notary Lozano is related to Victoriano Cruz Lozano, a "donee" receiving 2½% interest under the Act. However Santos Perez Calix, witness to Instruments 3, 4, and 5 testified that Notary Lozano worked for Oscar Siri-Zuniga (a "donee") for five years (Tr. p. 489-490). See Carbon as these pages are missing from the original record.
[8] There is no evidence indicating whether or not this Portillo is related to Gustavo Portillo, witness to Instruments # 3, 4, and 5 or Humberto Portillo, the 58 year old "driver" and witness to the will. It should be noted that the affidavit is admissible as evidence as an admission against interest.
[9] Clara Luz Espane Pinto was also a witness to the will.
[10] P-1 is the document which was at issue in Velasquez I, i.e. the "First Copy".
[11] Tr. Vol. IV p. 420.
[12] Tr. Vol. IV, p. 523.
[13] For interpretations of paragraph 3, See: Day & Wife v. Thibodeau, 5 Mart. (N.S.) 48 (W.Dist., 1826); Succ. of Senac, 2 Rob. 258 (New Orleans, 1842), on rehearing 2 Rob. 262 (New Orleans, 1842); Succ. of Herber, 128 La. 111, 54 So. 579 (1911); R.S. 9:2401, "The Uniform Wills Act."
[14] Amended by Acts 1979, No. 711, Section 1. Last paragraph redesignated from C.C. art. 3532, as amended by Acts, 1960, No. 30, Section 1, by Acts 1983, No. 173, Section 2.
[15] It should be noted that all of the Consular certifications contain the language "For the contents of the annexed document the Embassy assumes no responsbility." The certification generally provides that the notary who passed the Act was in fact a duly commissioned and qualified notary of his country on the day that the document was presented to the Embassy and that to his "official acts faith and credit are due." The Embassy does not warrant, of course, that the document presented to them was an "official act."
[16] Since the rise to prominence of the "manifest error" rule under Canter v. Koehring Co., 283 So.2d 716 (La., 1973) and Arceneaux v. Domingue, 365 So.2d 1330 (La., 1978), it is the preference of the appellate court to receive written reasons for judgment. The law review article cited pre-dates Canter and Arceneaux.
[17] See the last three paragraphs of trial judge's "Written Reasons for Judgment" above.