667 So.2d 1148 (1995)
James HEBERT, et al., Plaintiffs-Appellants,
v.
SOUTHWEST LOUISIANA ELECTRIC MEMBERSHIP CORPORATION, et al., Defendants-Appellees.
No. 95-405.
Court of Appeal of Louisiana, Third Circuit.
December 27, 1995.
Rehearing Denied February 26, 1996.
*1152 Steven Gerald Durio, Lafayette, Robert M. McBride, Springfield, VA, for James Hebert, Mary Hebert, Chad Feerick, and Southwest Louisiana Electric Membership Corp. et al.
Charles E. Soileau, Rayne, for Acadia Parish Police Jury & Parish, Acadia.
Cynthia Carrie LeBourgeois, Lawrence N. Curtis, Lafayette, for State of Louisiana-DOTD, Kemper McSpadden.
Before DOUCET, C.J., and AMY and SULLIVAN, Judges.
AMY, Judge.
This case involves a single vehicle accident that occurred when a vehicle flipped over in a field close to the intersection of Louisiana Highway 370 and Acadia Parish Roads 3-1 and 3-69 on September 11, 1991. Kemper McSpadden, who was driving, and Chad Feerick, a back seat passenger, sustained personal injuries as a result of the accident. Steve Hebert, the front seat passenger, died in the accident. Southwest Louisiana Electric Membership Corporation (SLEMCO) owns a utility pole anchored by guy wire located in close proximity to the intersection. Plaintiffs[1] sued SLEMCO, the Acadia Parish Police Jury, and the State of Louisiana through the Department of Transportation and Development (DOTD). The district court rendered judgment in favor of the defendants dismissing all of the plaintiffs' claims. For the following reasons, we affirm.

DISCUSSION OF THE RECORD
During the evening of September 10, 1991, plaintiffs Kemper McSpadden and Chad Feerick went to a gym near the University of Southwestern Louisiana to exercise. Immediately afterwards at approximately 9:30 P.M., McSpadden drove himself and Feerick to Fat Steve's Grocery, an establishment owned and operated by the Hebert family, who are also plaintiffs in the present lawsuit, in a 1985 Toyota Celica Convertible owned by McSpadden's father, Dr. Joseph McSpadden. At Fat Steve's, McSpadden and Feerick visited with Steve Hebert, who was killed later in the evening as a result of the accident at issue. McSpadden testified that he had one beer at Fat Steve's and had three or four sips of a second beer. Chad Feerick testified that he saw McSpadden drink one beer at Fat Steve's.
Kemper McSpadden, Chad Feerick, Steve Hebert, and Randy Hebert left Fat Steve's at approximately 10:30 P.M. and walked to the Fat City Bar. McSpadden testified that he played foosball and consumed five or six ounces of a 10-ounce beer there. The four wished to play pool, but were unable to play pool at the Fat City Bar, so they walked to the Loose Caboose Bar. At the Loose Caboose, Randy Hebert purchased a Tom Collins for McSpadden. At trial, McSpadden testified that he did not drink the Tom Collins, but merely sucked on the ice cubes in the drink because he does not like gin. The four played pool for approximately a half hour and then left. Next, they walked to Shanahan's and played two games of pool. McSpadden testified that he did not have anything to drink at Shanahan's. After finishing the second game of pool, they returned to Fat Steve's Grocery. Feerick testified that McSpadden had nothing to drink after leaving Shanahan's. But, at trial, it was established that McSpadden and Feerick had given statements at earlier depositions *1153 which differed from their trial testimony about the amount of liquor McSpadden had consumed.
At around 11:30 P.M., Steve Hebert, who did not own a car, asked McSpadden to drive him to his apartment near Evangeline Downs. Feerick went along for the ride. McSpadden and Feerick testified that McSpadden obeyed all traffic signals on the way to Hebert's apartment.
After they arrived at Hebert's apartment, Hebert got out of the car and ascertained that his girlfriend was not at his apartment. He then asked McSpadden to drive him to his girlfriend's house in Church Point. McSpadden agreed. He traveled on Interstate 10 and proceeded west until he reached the second exit in Crowley, which he took to Louisiana Highway 13 and proceeded north toward Eunice. On the way, McSpadden indicated to Hebert that he wanted to return to Lafayette. McSpadden, who was unfamiliar with the area, relied on directions from Hebert to return to Lafayette, who instructed him to head in an easterly direction on Highway 370 toward its intersection with Parish Roads 3-69 and 3-1.
Highway 370 is a blacktop highway which forms a four-leg intersection with Parish Roads 3-69 and 3-1. Before the intersection, Highway 370 runs east and west, but at the intersection it makes a 90 degree turn to the north. Intersecting Highway 370 from the east and south are Parish Roads 3-69 and 3-1 respectively, which are both gravel roads. The trial court found that the following signs were in place to alert a driver traveling eastward on Highway 370 toward the accident location on the date of the accident: (1) Drive carefully, substandard roadway; (2) Advance turn assembly, with 15 m.p.h. speed advisory plate; (3) Advance route marker assembly; (4) Route assembly at turn of Highway 370; and (5) Object marker at turn of Highway 370. McSpadden testified at trial that he did not recall seeing any signs on Highway 370; whereas, in an earlier statement he had indicated that he saw the advance turn sign.
McSpadden testified that he entered the intersection at approximately 40 m.p.h. Feerick testified that they were traveling at approximately 45 m.p.h. when they approached the intersection. At the intersection of Highway 370 with Parish Road 3-69, McSpadden testified that Hebert told him to go straight. McSpadden and Feerick testified that it appeared that the road continued going straight. Instead of following Highway 370 and turning north, McSpadden continued east onto Parish Road 3-69 past the intersection and lost control of the vehicle. As they left Highway 370, which was paved, and entered into its intersection with Parish Roads 3-69 and 3-1, which was gravel, McSpadden testified that he down shifted because he felt the change in elevation. Feerick also noticed the change in elevation.
McSpadden testified that upon entering the gravel surface, he lost control of the vehicle and the car fishtailed and overturned. Feerick testified that the car began to fishtail when they entered the intersection. Some distance past the intersection the car overturned. Feerick testified that it sounded like the car came into contact with something metal and that he heard a loud bang. McSpadden testified that he heard a loud bang or pop when the car flipped over. At trial, plaintiffs asserted that before the car overturned, the vehicle collided with a steel guy wire attached to SLEMCO's utility pole which was anchored to the ground within the right of way of Parish Road 3-69. Plaintiffs also assert that the collision with the guy wire and/or guy anchor was the factor which caused the vehicle to overturn.
McSpadden and Hebert were trapped beneath the vehicle. Hebert died at the scene of the accident shortly thereafter due to a head injury. The car embedded into McSpadden's abdomen causing hemorrhaging, and the car door tore the flesh off his right arm. Feerick was ejected from the vehicle on impact. Feerick, who sustained a back injury, was able to leave the scene of the accident in order to obtain help. Feerick testified that he tripped in several potholes along Parish Road 3-69 when he was trying to get help. He testified that he tripped while running to get help, not because he was intoxicated, but rather because he was upset and injured.
*1154 Randal Leger, a Louisiana state trooper, while on his way to the scene of the accident, encountered Feerick standing in the middle of Parish Road 3-69 at approximately 4:00 A.M. Trooper Leger testified that he believed Feerick was intoxicated based upon his slurred speech, lack of balance, and the detection of a very strong odor of alcohol. Trooper Leger was the first law enforcement official to arrive on the scene of the accident. He arrived at approximately 4:30 A.M. He first spoke to McSpadden whose lower torso and right arm were pinned under the car on the driver's side and who appeared to be going into shock. Trooper Leger testified that he detected a strong odor of alcohol on McSpadden's breath. At trial, McSpadden testified that he was not impaired at the time of the accident. After conversing with Trooper Leger briefly, McSpadden asked him to check on Hebert. Upon doing so, it became apparent to Trooper Leger that Hebert had died.
Kyle LeBoeuf, the state trooper who completed the accident report and investigation, arrived on the scene of the accident at 4:49 A.M. He reported that the McSpadden vehicle was upside down and located less than 500 feet from the intersection of Highway 370 and Parish Road 3-69. He measured 163 feet from a 35-m.p.h. speed limit sign on Parish Road 3-69 to the vehicle's point of rest. He determined that the vehicle traveled 150 feet from the shoulder on the side of Parish Road 3-69 to its final point of rest. Trooper LeBoeuf noted that the gravel on Parish Road 3-69 was dry. He detected the smell of alcohol on McSpadden's breath. Trooper LeBoeuf testified at trial that he had no knowledge that the SLEMCO utility pole or guy wire was involved in the accident.
McSpadden was transported to Moosa Memorial Hospital. At the hospital, sometime after 7:30 A.M., Trooper LeBoeuf noticed that McSpadden's speech was slurred and that his breath still smelled of alcohol. Dr. Joseph McSpadden testified that he did not observe the odor of alcohol on his son's breath at the hospital. On the advice of his father, Kemper McSpadden refused to take a blood alcohol test requested by law enforcement officials. Hebert's blood alcohol test was taken by Dr. Dawson at the funeral home, which indicated a blood alcohol content of .015 percent. In a deposition taken prior to trial, McSpadden stated that Hebert was intoxicated, while at trial, he testified that Hebert was not incoherent and seemed alert while giving directions. At trial, Feerick testified that Hebert was "obviously intoxicated" because of the amount of liquor he drank, but that nothing from Hebert's conduct or actions led him to conclude that Hebert was drunk.
At trial, James Harold Reed, who was the road supervisor for Acadia Parish at the time of the accident, testified that he heard about the accident and the resulting fatality on the radio around 5:30 A.M. on September 11, 1991, and that soon after he went out to check the road conditions. He testified that the road appeared to be in good shape and that nothing raised his concerns as a road supervisor. Patrick Henry Prather, a SLEMCO employee, testified that he visited the scene of the accident on the morning of September 11, 1991, or the following day. He testified that the guy wire on the SLEMCO pole was intact and that the pole did not appear to be damaged. A few days after the accident, Dr. McSpadden returned to the scene to take pictures and observed pot holes in the gravel. Photographs taken on September 13, 1991, show that the guy wire was detached. James D. Brooks, SLEMCO insurance and personnel agent, testified that the SLEMCO pole was repaired on November 7, 1991, and that he had nothing other than the September 11, 1991, accident to relate the repairs or the damage to.
On January 8, 1992, Chad Feerick and James and Mary Hebert, Steve Hebert's parents, filed suit against SLEMCO, the Acadia Parish Police Jury, and DOTD. On January 29, 1992, SLEMCO answered plaintiffs' petition denying liability and filed cross claims against Acadia Parish Police Jury and DOTD and a third-party claim against Kemper McSpadden. On February 10, 1992, Acadia Parish Police Jury answered plaintiffs' petition denying liability and filed cross claims against SLEMCO and Kemper McSpadden. On April 30, 1992, the State of Louisiana *1155 through DOTD filed an answer to plaintiffs' petition denying liability and filed a third-party claim against Kemper McSpadden and a cross claim against SLEMCO and Acadia Parish Police Jury. On July 15, 1992, Kemper McSpadden filed a petition for damages against SLEMCO, Acadia Parish Police Jury, and the State of Louisiana through DOTD. On September 11, 1992, the two cases were consolidated.
A trial on the merits began on March 1, 1994. At the conclusion of plaintiffs' case in chief, SLEMCO and Acadia Parish moved to dismiss the claims against them pursuant to La.Code Civ.P. art. 1672(B). On March 22, 1994, the district court granted this motion in favor of SLEMCO and dismissed plaintiffs' claims against SLEMCO with prejudice. The district court denied the motion with respect to Acadia Parish. After the close of all the evidence, the district court took the remaining issues under advisement and rendered judgment in favor of Acadia Parish Police Jury and DOTD and dismissed all of plaintiffs' claims against them with prejudice.
Plaintiffs timely perfected this appeal. Plaintiffs James Hebert, Mary Hebert, and Chad Feerick filed a brief together and asserted seven assignments of error. Plaintiff McSpadden filed a separate brief, asserting four assignments of error. We will consider all assignments of error relating to each defendant together, first with SLEMCO.

SLEMCO
At trial, plaintiffs asserted strict liability and negligence claims against SLEMCO. SLEMCO stipulated that it owned and had custody of the power pole at issue. At trial, it was established that the SLEMCO pole was located on the south side of Parish Road 3-69, 330 feet east of the center line of Highway 370. The pole is anchored with a guy wire installed onto a cross arm which extends partially over the roadside ditch. It was anchored in the ground by an anchor rod driven into the back slope of the ditch. Ronald Sarver, plaintiffs' civil engineer expert, testified that the anchor rod was embedded nine feet from the usable portion of Parish Road 3-69. Duaine T. Evans, who was accepted by the trial court as plaintiffs' expert in traffic engineering and accident reconstruction, testified that the guy wire was six and a half feet from the usable lane of Parish Road 3-69. Eugene F. Tims, accepted by the trial court as plaintiffs' expert in electrical engineering, testified that the SLEMCO anchor rod was 25 or 26 inches above the surface of the ditch.
Feerick testified that after the McSpadden vehicle left the roadway, it sounded like the car came into contact with something metal and that he heard a loud bang. McSpadden testified that he heard a loud bang or pop when the car flipped over. Luther Cox, accepted by the trial court as plaintiffs' expert in mechanical engineering and accident reconstruction and causation, testified that the SLEMCO pole was 34 feet from the vehicle's point of rest and that it was his opinion that the McSpadden vehicle encountered the anchor system in the ditch before it overturned. Evans opined that the McSpadden vehicle entered the ditch and struck the SLEMCO guy wire at the SLEMCO pole which precipitated the rotation of the vehicle and its eventual overturning. He believed that the McSpadden vehicle flipped when its left front wheel came into contact with the guy wire. He based his opinion on damage underneath the vehicle and damage to the guy wire. He did not think the vehicle had struck the SLEMCO pole. Since the trial court granted SLEMCO's motion for involuntary dismissal, SLEMCO did not present its case. State Trooper LeBoeuf testified at trial that he had no knowledge that the SLEMCO utility pole or guy wire was involved in the accident.
The Heberts' assignments of error relating to SLEMCO include: (1) Their first assignment of error: the lower court erred in failing to address the claim that SLEMCO was strictly liable under Article 2317 or by requiring proof of "notice" against SLEMCO; (2) Their fifth assignment of error: the court below erred in failing to find that the elevation and proximity of SLEMCO's abandoned guy anchor was an unreasonably dangerous or defective condition; and (3) Their sixth assignment of error: the lower court erred in failing to find that SLEMCO had constructive notice of the danger of its guy anchor. *1156 McSpadden asserts the following assignments of error with respect to SLEMCO: (1) His first assignment of error: the trial judge erred in failing to consider the asserted negligence utilizing a duty/risk analysis; and (2) His third assignment of error: the trial judge erred in failing to find that SLEMCO owed a duty to this plaintiff to keep its equipment out of the "clear recovery area" adjacent to the roadway.
As to the applicable standard of review, we consider the arguments of the Heberts and Feerick first.
In the first assignment of error of the Heberts and Feerick, we are asked to consider whether the trial court's determinations on their strict liability claims against SLEMCO are to be reviewed under the manifest error standard of review or de novo.
At the close of plaintiffs' case, the trial court granted an involuntary dismissal in favor of SLEMCO. Under La.Code Civ.P. art. 1672, in a case tried by the court without a jury, any party may move for an involuntary dismissal after plaintiffs have completed the presentation of their evidence on the ground that, under the facts and the law, plaintiffs have shown no right to relief. When a motion to dismiss is made at the close of the plaintiffs' case, the trial court must consider and weigh all the evidence presented by the plaintiffs and is required to grant a dismissal if it concludes that the plaintiffs failed to prove by a preponderance of the evidence their entitlement to relief. Shafer v. State, Through Dept. of Transp. and Development, 590 So.2d 639 (La.App. 3 Cir.1991). Normally, the propriety of a trial court's grant of a motion for involuntary dismissal is evaluated under the manifest error standard of review. Shafer, 590 So.2d 639; Hutzler v. Cole; 93-486 (La.App. 1 Cir. 3/11/94); 633 So.2d 1319, writ denied, 94-0850 (La.5/13/94); 637 So.2d 1070; Poland v. Glenn, 623 So.2d 227 (La.App. 2 Cir.), writ denied, 629 So.2d 1171 (La.1993). The manifest error test requires the reviewing court to consider the record as a whole to ascertain whether the trier of fact's findings and conclusions constituted manifest error. Since the trier of fact's findings are accorded great weight on appeal under this standard of review, an appellate court may only reverse if it concludes from the record that a reasonable factual basis does not exist for the trier of fact's findings and the appellate court must further determine that the findings were clearly wrong based on the record. Stobart v. State through DOTD, 617 So.2d 880 (La.1993). Nevertheless, the manifest error standard of review is not applicable when a reviewing court concludes that trial court committed an error of law which interdicted the fact finding process. When such an error of law has been made, the appellate court is to review the evidence de novo and apply the correct legal principles. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La. 2/20/95); 650 So.2d 742.
On appeal, Feerick and the Heberts point to the trial court's written reasons for judgment to argue that the trial court committed an error of law when considering whether to grant SLEMCO's motion for involuntary dismissal. In assigning written reasons for judgment, the trial court wrote:
Plaintiffs assert that SLEMCO, in its placement of the guy wire and/or guy anchor and in its failure to warn of the hazards presented by the guy wire and/or guy anchor, was negligent. Plaintiffs are also asserting that SLEMCO is strictly liable as the owner of the guy wire and/or guy anchor.
While it is disputed as to the exact location of the guy wire anchor at the time of the accident, the Court is of the opinion that from the evidence presented, it was more likely located on the back slope of the ditch.
It is not disputed, however, that the driver lost control of the vehicle and traveled into the ditch to make contact with the guy wire anchor.
The roadside ditch is constructed and maintained for the purpose of draining the highway. Because the roadside ditch is intended for drainage and not vehicular use, there was no duty on the part of SLEMCO to construct or maintain the guy wire and/or guy wire anchor located on the back of the ditch in such a way that it did not pose an unreasonable risk of danger for vehicles in the ditch.

*1157 Additionally, the Court does not find that SLEMCO had notice of any defect or of any earlier accidents involving the guy wire or anchor. Accordingly, SLEMCO had no reason to conclude that the guy wire or guy anchor constituted a foreseeable and unreasonable risk upon users of the roadway.
For the foregoing reasons, the Court grants SLEMCO's Motion to Dismiss.
[Citations omitted].
The error of law, of which Feerick and the Heberts complain, is that the trial court either erred by requiring that the plaintiffs prove that SLEMCO had knowledge of the alleged defects on their strict liability claim or erred by failing to address this aspect of liability.
To recover under La.Civ.Code art. 2317, a plaintiff must establish that (1) the thing causing his damage was in the custody of the defendant; (2) the thing had a "defect" or a condition creating an unreasonable risk of harm; and (3) the defective condition caused plaintiff's injuries. Oster v. Department of Transp. and Development, 582 So.2d 1285 (La.1991); Bealer v. National Tea Co., 597 So.2d 1242 (La.App. 3 Cir.1992). An additional element of proof must be established when a strict liability claim is asserted against a public entity. Specifically, La.R.S. 9:2800 requires that the plaintiff prove that the defendant had actual or constructive notice of the purported defect and failed to remedy it within a reasonable amount of time. Bessard v. State, Dept. of Transp. and Development, 93-507 (La.App. 3 Cir. 2/9/94); 640 So.2d 309; affirmed, 94-0589 (La. 11/30/94); 645 So.2d 1134. Since SLEMCO is not a public entity under La. R.S. 9:2800, plaintiffs were not required to prove that SLEMCO had knowledge of the alleged defect in order to recover under strict liability.
While a trial court's reasons for judgment do provide an important aid for an appellate court to determine if the trial court applied the correct legal principles, they are not dispositive because the correctness of the judgment, rather than the reasons for judgment, is what an appellate court reviews. Wright v. Ocean Drilling and Exploration Co., 461 So.2d 1084 (La.App. 4 Cir.1984); Caldwell v. Second Judicial District Indigent Defender Board, 475 So.2d 96 (La.App. 2 Cir.), writ denied, 477 So.2d 1126 (La.1985), citing Riche v. Ascension Parish School Board, 200 So. 681 (La.1941); See also Gilbert v. Heintz, 231 La. 535, 91 So.2d 784 (1956). As previously stated, the Heberts and Feerick in their appeal and McSpadden in his appeal ask this court to conduct a de novo review of the evidence, rather than applying the manifest error standard of review.
The Heberts and Feerick asserted strict liability and negligence claims. On review, we note that the trial court's reasons for judgment do not clearly delineate a discussion between strict liability and negligence. The plaintiffs suggest that the trial court's language in its reasons for judgment and the case law cited by it indicate that the trial court erroneously believed that plaintiffs had to prove that SLEMCO had knowledge of the alleged defects to be held strictly liable under Article 2317. Nevertheless, because a trial court committed an error of law does not automatically result in a de novo review. We must consider whether this error of law was harmless or prejudicial. See Succession of Velasquez-Bain, 471 So.2d 731 (La.App. 4 Cir.), writ denied, 476 So.2d 354 (La.1985). If the error of law was harmless in that it did not affect the outcome of the case at trial, then the trial court's factual findings are entitled to be reviewed under the manifest error standard of review.
The trial court determined that: "Because the roadside ditch is intended for drainage and not vehicular use, there was no duty on the part of SLEMCO to construct or maintain the guy wire and/or guy wire anchor located on the back of the ditch in such a way that it did not pose an unreasonable risk of danger for vehicles in the ditch." The Louisiana Supreme Court has held that La. Civ.Code art. 2317 imposes the same duty in strict liability cases as in negligence cases under La.Civ.Code art. 2315 and that under both articles "liability hinges on whether the defendant has breached his duty to the plaintiff." Myers v. State Farm Mut. Auto Ins. Co., 493 So.2d 1170, 1171 (La.1986); Kent v. *1158 Gulf States Utilities Co., 418 So.2d 493 (La. 1982). Thus, the trial court's determination that SLEMCO did not owe a duty to the plaintiffs was an appropriate and correct legal basis for the trial court to dismiss the plaintiffs' strict liability claims.
For these reasons, any error of the trial court requiring notice on the strict liability claims against SLEMCO was not a prejudicial error of law. At most, any legal error of the trial court on the notice issue was harmless as it would not affect the disposition of the case because the duty question is dispositive on the strict liability claims; therefore, the trial court's findings of fact dismissing the Heberts' and Feerick's claims against SLEMCO are entitled to be reviewed under the manifest error standard of review.
As to McSpadden's arguments, by his first assignment of error McSpadden similarly asserts that the trial court committed a legal error and that the manifest error standard of review is inapplicable. He asks this court to conduct a de novo review of the evidence with respect to the trial court's treatment of the negligence claim he asserted against SLEMCO. Specifically, he contends that the trial court failed to engage in the duty-risk analysis beginning with the determination of whether there was cause in fact, but instead considered in the abstract that no duty was owed.
Under La.Code Civ.P. art. 1917, a trial court in a bench trial is required, when requested, in all appealable contested cases to give in writing its findings of fact and reasons for judgment. In considering whether a party is negligent under Article 2315, there are four elements which must be considered by the trier of fact: (1) Whether the conduct in question is a cause-in-fact of the resulting harm; (2) What are the duties, if any, owed?; (3) Was there a breach of the duties?; and (4) Was the risk and harm caused within the scope of the protection of the breached duty? Theriot v. Lasseigne, 93-2661 (La. 7/5/94); 640 So.2d 1305; Faucheaux v. Terrebonne Consol. Government, 615 So.2d 289 (La.1993). A plaintiff's negligence claim is defeated upon his failure to prove any one of the four elements necessary to impose liability. Thus, while McSpadden is correct that a fact-finder is required to engage in a cause-in-fact analysis under duty-risk, there is no requirement imposed by Article 1917 that the trial court set forth, demonstrate, or articulate separately in its reasons for judgment that it considered every prong of the duty-risk analysis. Simply put, we conclude that a trial court's reasons for judgment in an involuntary dismissal are sufficient under Article 1917 and its factual determinations are entitled to deference under the manifest error standard of review where they demonstrate that the trial court correctly applied the law, concluded that the plaintiff failed to meet his burden on any of the four elements, and set forth the facts supporting its conclusion. As discussed above, the trial court clearly found that SLEMCO owed no duty, which was a correct legal basis to dismiss McSpadden's negligence claim. Since the trial court correctly applied the law and made specific factual findings on this issue, its findings of fact dismissing McSpadden's negligence claim against SLEMCO are entitled to be reviewed under the manifest error standard of review. Accordingly, McSpadden's first assignment of error lacks merit.
As to plaintiffs' remaining assignments of error concerning SLEMCO, the Heberts and Feerick in their fifth assignment contend that the trial court erred in failing to find the SLEMCO guy anchor's elevation in the ditch and proximity to the road presented an unreasonable risk of harm under La.Civ.Code art. 2317 or was unreasonably dangerous under La.Civ.Code art. 2315.
The alleged defects in this case are the placement and location of the SLEMCO pole, guy wire and anchor, rather than some inherent defect in the guying system. SLEMCO does not dispute that it had knowledge of the location and proximity of the pole to Parish Road 3-69, which are the very conditions that are alleged to be defective. Because the placement and location of the pole were known to SLEMCO, it is irrelevant whether we analyze its liability in terms of strict liability or negligence because under both theories the pertinent issues are the same, namely, the reasonableness of the risk presented by the pole and the guy wire. Hart v. *1159 Louisiana Power & Light Co., 486 So.2d 936 (La.App. 1 Cir.1986).
The simple fact that an accident occurred does not mean that a thing presents an unreasonable risk of harm or is unreasonably dangerous. Manuel v. Wal-Mart Stores, 93-1243 (La.App. 3 Cir. 5/4/94); 640 So.2d 579, writ denied, 94-1442 (La. 9/23/94); 642 So.2d 1291. In assessing whether a thing presents an unreasonable risk of harm, not only is the utility of the thing balanced against the likelihood and magnitude of the risk; also considered is "a broad range of social, economic, and moral factors including the cost to the defendant of avoiding the risk and the social utility of the plaintiff's conduct at the time of the accident." Oster, 582 So.2d at 1289; Celestine v. Union Oil Company of California, 93-1330 (La.App. 3 Cir. 5/4/94); 636 So.2d 1138, affirmed, 94-1868 (La. 4/10/95); 652 So.2d 1299.
The trial court found that the pole was on the far side of the ditch. We find no manifest error in that conclusion. Evidence at trial also established that the roads in question were lightly traveled and that the guy rod was imbedded nine feet from the usable portion of Parish Road 3-69 and that the guy wire was six and a half feet from the usable lane of Parish Road 3-69. Therefore, there was only a minimal risk that a vehicle would come into contact with the pole.
The duty imposed by the law is to take reasonable measures to protect against an unreasonable risk of harm or danger. Rogers v. Parish of East Baton Rouge, 577 So.2d 1068 (La.App. 1 Cir.), writ denied, 580 So.2d 925 (La.1991). With respect to trial court's conclusion that SLEMCO did not owe a duty, the Heberts and Feerick assert that this is error because the American Association of State Highway and Transportation Officials (AASHTO) standards establish a clear zone of recovery for highways and that their experts testified that these were violated by the placement of the pole. Eugene F. Tims, the plaintiffs' expert in electrical engineering, testified that 1990 AASHTO guidelines were violated by the placement of the pole and guying system because they provide that these appurtenances should not be placed in the highway "clear zone," a clear zone of recovery for errant vehicles that leave the roadway, because errant vehicles could strike them. In Nicks v. Teche Elec. Co-op, Inc., 93-1418 (La.App. 3 Cir. 6/1/94); 640 So.2d 723, writ denied, 94-1710 (La. 10/7/94); 644 So.2d 640, this court recognized that the utility company under the facts of that case had a duty to keep its utility poles and equipment out of the clear recovery zone of a highway as mandated by the AASHTO manual. The pole at issue in Nicks was a new pole which was going to be installed and was left lying on the side of the highway; whereas, the pole in this case had been installed at least twenty-six years before trial and was functional. Furthermore, Nicks involved a federal aid highway and a driver leaving the road to avoid a head-on collision; whereas, the road in this case was a parish road with a low volume of traffic, the utility pole was on the far side of a ditch on the south side of the road, and McSpadden was speeding and lost control of his vehicle himself. This court in Nicks weighed the factors from Oster and concluded that the plaintiff's action in leaving the road to avoid a head on collision had distinct social utility; whereas, the utility company's decision to leave the pole on the side of the road was an unreasonable risk considering the minimal cost of moving it. We find Nicks to be legally and factually distinguishable on these bases. Furthermore, the anchor in the case sub judice had been in the ground more than the 26 years before trial. The AASHTO manual introduced at trial was promulgated in 1990. The Louisiana Supreme Court in Dill v. State, Dept. of Transportation and Development, 545 So.2d 994, 996 (La.1989), stated that while "[d]esign standards both at the time of original construction and at the time of the accident may be relevant factors for consideration" on the issue of liability, they are not determinative because the critical inquiry remains whether something presents an unreasonable risk of harm.
None of plaintiffs' experts nor any lay witness testified that the SLEMCO guy wire and pole presented an unreasonable risk of harm to vehicles on the road. In fact, Eugene F. Tims and Robert Nethken, also accepted by the trial court as an expert in *1160 electrical engineering, both testified that the guying system posed no hazard to a vehicle which remained on the road. No evidence was introduced that the pole and guying system were inherently defective. In fact, Tims testified that the installation of the guy wire and utility pole complied with Section 231(B)(2) of the 1990 National Electrical Safety Code (NESC) and that the guying system was constructed in conformity with REA standards and its configuration and installation was consistent with the systems of LP & L, CLECO, and GSU, with the exception of the guy anchor being more than six inches above the ground. Nethken testified that the NESC did not mandate how many feet the pole should be placed away from the roadway and that the DOTD Standards Manual, which had a standard that utility poles should be kept out of the rights of way along road ways if practical, did not make these standards applicable to parish roads.
The guying system has a high social utility in keeping electrical lines above the ground and the roads. A motorist has a duty to control his vehicle and maintain a proper lookout. Andrus v. State, Dept. of Transp. and Dev., 476 So.2d 1077 (La.App. 3 Cir. 1985). Evidence at trial established that the plaintiffs were drinking and that McSpadden was speeding, not paying attention to road signs, and lost control of his vehicle, which resulted in his vehicle leaving the road and coming into contact with the guy system. The collision with the guying system could have been avoided had McSpadden kept a proper lookout and had been traveling at the advised speed and had maintained control of his vehicle.
Tims testified that the SLEMCO anchor rod would not be as hazardous if it were only six inches above the ditch's bottom and plaintiffs' experts did suggest safer alternative locations. The mere existence of safer alternatives does not by itself render the object unreasonably dangerous or an unreasonable risk of harm. As we have said, the utility of the thing must be balanced against the likelihood and magnitude of the risk and social, economic, and moral factors including the cost to the defendant of avoiding the risk and the social utility of the plaintiff's conduct at the time of the accident. In Armand v. La. Power and Light Co., 482 So.2d 802 (La.App. 4 Cir.), writ denied, 484 So.2d 669 (La.1986), the fourth circuit considered whether the location of a pole 29 to 30 inches from the side of the road was unreasonably dangerous. All testimony at trial established that the pole was erected in 1961 when no industrial or governmental standards existed regulating placement. All agreed that the pole could have been relocated or reshaped. The fourth circuit held:
The location of the pole did not create an unreasonable risk of harm. To hold so would create absolute liability. We are cognizant of the inestimable number of poles and trees which line our streets, many next to or a few inches off the roadways. LP & L's pole is no more a legal cause of Joni's (plaintiff) injuries than if she had hit an object in the road, lost control, then struck the pole. The pole's location ... was not a cause in fact of the accident, nor was it a substantial contributing factor. A utility company has no obligation to guard against rare exigencies such as an out of control vehicle leaving a traveled roadway.
482 So.2d at 804.
A duty to relocate a pole "may arise when experience has shown that the location of the pole presents an unreasonable risk to the motoring public. If the nature of the street is such that motorist, albeit inattentive or careless, frequently leave the street and hit the pole, the utility company may have a duty to correct the hazard its pole creates if there exists reasonable alternative locations which would minimize the risk of harm." Duplissey v. City of Bastrop, 561 So.2d 796, 798 (La.App. 2 Cir.1990).
There was no evidence introduced at trial that motorists frequently left Parish Road 3-69 and struck the SLEMCO system. The only evidence introduced at trial that this particular pole and system had posed a hazard to errant vehicles in the past was Martha Jacob's testimony at trial about her own accident on April 11, 1983 at this particular intersection when her truck hit the SLEMCO power pole and flipped over. But, in a *1161 sworn statement she gave on February 19, 1993, she had stated that the levee on the field side of the ditch had caused her to flip over rather than the pole. Since her trial testimony was inconsistent with a previous sworn statement, it was not manifest error for the trial court to have rejected her testimony. Patrick Henry Prather, SLEMCO service man, and James D. Brooks, SLEMCO insurance and personnel agent, had no knowledge of any accidents involving this particular power pole or any other along Parish Road 3-69. Prather testified that the guy anchor was at least 26 years old and that it was behind the ditch before the ground eroded. Since the possibility of an out of control vehicle leaving Parish Road 3-69 and striking the SLEMCO system was only a rare exigency, we find the reasoning set forth in Armand to be persuasive. Accordingly, we conclude that SLEMCO had no duty to relocate the system.
To reverse the trial court's determination that plaintiffs did not prove by preponderance of the evidence that SLEMCO was liable to them at the close of their case under the manifest error rule, we would have to conclude from the record that a reasonable factual basis does not exist for the trier of fact's findings and that the finding was clearly wrong based on the record. For the reasons discussed, we do not conclude that the trial court was clearly wrong in concluding that SLEMCO owed no duty under the facts of this case because the guy system did not present an unreasonable risk of harm under the facts of this case. Thus, we conclude that the trial court did not err in dismissing plaintiffs' claims. The fifth assignment of the Heberts and Feerick lacks merit.
In their sixth assignment of error, the Heberts and Feerick contend that the lower court erred in failing to find that SLEMCO had constructive notice of the danger of its guy anchor. Because we have determined that the trial court was not clearly wrong in concluding that the anchor and guy wire did not present an unreasonable risk of danger or harm, this assignment of error necessarily lacks merit.
In McSpadden's third assignment of error, he contends that the trial judge erred in failing to find that SLEMCO owed a duty to this plaintiff to keep its equipment out of the "clear recovery area" adjacent to the roadway. For the reasons discussed above, this assignment of error lacks merit.

DOTD
At trial, plaintiffs asserted that DOTD was negligent or strictly liable because of its (1) failure to adequately warn of the "abrupt" turn; (2) failure to adequately warn of the "abrupt" drop-off onto Parish Road 3-69 from Highway 370; (3) failure to warn of the "misalignment" of the roads (Parish Road 3-69 is narrower than Highway 370 and offset three and a half feet to the left of Highway 370); and (4) failure to warn in the change in surface (Parish Road 3-69 is gravel; where as, Highway 370 is paved.) At the close of all the evidence, the trial court dismissed all of plaintiffs' claims against DOTD.
By the fourth assignment of error, the Heberts and Feerick contend that the trial court erred in failing to find that the drop in elevation, misalignment, and change from asphalt to gravel in the absence of any warning constituted an unreasonably dangerous or defective condition.
DOTD is not the guarantor of safety on the State's highways; therefore, not every minor imperfection or irregularity in a highway or a road constitutes an unreasonably dangerous condition which gives rise to liability. Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La. 1/14/94); 630 So.2d 1289; Burris v. Insured Lloyds, 417 So.2d 511 (La.App. 3 Cir.), writs denied 420 So.2d 982, 984 (La. 1982). While the determination of whether a roadway condition is unreasonably dangerous depends on the facts and the circumstances present in each case, what must be resolved by the trier of fact is whether the alleged defect was obviously dangerous or presented an unreasonable risk of injury to a reasonably prudent motorist. Hunter v. State, DOTD, 620 So.2d 1149 (La.1993). Design standards can be relevant evidence for the trial court's consideration. Id. As we noted in our previous discussion, in assessing the risk of harm presented by an allegedly defective *1162 thing, the trier of fact is to balance the utility of the thing against the likelihood and magnitude of the risk; also to be considered is "a broad range of social, economic, and moral factors including the cost to the defendant of avoiding the risk and the social utility of the plaintiff's conduct at the time of the accident." Oster, 582 So.2d at 1289.
With respect to the alleged drop-off, the record demonstrates that plaintiffs presented the following evidence: Trooper Leger testified that the drop-off was a gradual three-foot drop-off over a distance of ninety to ninety-five feet. Ronald D. Sarver, the plaintiffs' expert in civil engineering and land surveying, testified that the drop-off from Highway 370 to Parish Road 3-69 was on the average a one-third inch per foot drop and that it was a gradual drop rather than intermediate. Luther Cox, the plaintiffs' expert in mechanical engineering and accident reconstruction and causation, testified that there was nothing he knew of indicating that the change in elevation was inappropriate at speeds of 35 m.p.h. or 55 m.p.h. Joseph Thibodeaux, a nearby resident, testified that there was no sign warning about the dip and that it could not be seen at night, but that you could see the gravel road ahead. Herbert J. Thibodeaux, a nearby resident, testified that the dip was gradual and never caused him to lose control of his school bus. Herbert Thibodeaux testified that while there was a sign to slow down-substandard roadway, there was no sign on Highway 370 warning that there was a one foot dip. Plaintiffs' expert Cox testified that the intersection was defectively signed because there was no warning that the grade changed. Evans testified that a cause of the accident was the change in elevation as a driver traveled from Highway 370 to Parish Road 3-69.
The defendants' expert in traffic engineering, Dr. Joseph Blaschke, testified that there was no requirement that the State warn about the dip, that the 15 m.p.h. speed advisory on Highway 370 before it intersected with Parish Road 3-69 should be obeyed immediately, and that there was no need for additional warnings.
The trial court found that the change in elevation was not defective or unreasonably dangerous and wrote: "The change in elevation at the interchange of Louisiana Highway 370 and Parish Road 3-69 measured approximately one-third (1/3) of an inch per foot. All witnesses who testified regarding the `dip' described the interchange as a gradual slope or incline, rather than an abrupt drop-off. Additionally, this change in elevation as measured by plaintiffs' expert was not violative of any applicable design criteria. Finally, Dr. Blaschke, an expert tendered [sic] the field of traffic engineering and human factors, testified that the `dip' was not defective or unreasonably dangerous. He also opined that the intersection could be traveled across at a speed of fifty-five (55) miles per hour without losing control. For these reasons, the Court finds that the change in elevation did not constitute a defect or an unreasonably dangerous condition."
With respect to plaintiffs' assertion that the "misalignment" of Parish Road 3-69 and Highway 370 was a defect or an unreasonably dangerous condition, the record demonstrates that Parish Road 3-69 was narrower than Highway 370 and was offset three and one-half feet to the left. In finding that the misalignment was not a defect, the trial court wrote: "The testimony elicited on this issue indicated that it was possible that a vehicle traveling on the far right side of Louisiana Highway 370 might, without steering, end up entering Parish Road 3-69 in its right ditch. The `misalignment,' however, was not proven to be a design defect."
At trial the plaintiffs' expert Evans testified that the narrowing of the road and the change from asphalt to gravel were causes of the accident. Herbert Thibodeaux testified that while there was a sign to slow down-substandard roadway, there was no sign on Highway 370 warning that the surface changed from black top to gravel or to slow down if one went straight. Luther Cox testified that the intersection was defectively signed as there was no warning that the surface changed from asphalt to gravel. Defendants' expert Blaschke testified that nothing in the AASHTO manual was contrary to the design of the intersection, that the 15 m.p.h. speed advisory should be obeyed immediately, *1163 and that there was no need for additional warnings.
The utility of highways is great and the record indicates that McSpadden was traveling at an excessive rate of speed, had consumed alcohol, and was not paying attention to the signs. Based on our review of the record, we are unable to conclude that the trial court was clearly wrong in failing to find that the drop in elevation, misalignment, and change from asphalt to gravel in the absence of any warning constituted an unreasonably dangerous or defective condition.
On appeal by their second assignment of error, the Heberts and Feerick contend that the trial court erred as a matter of law in holding that the State's duty to provide adequate warning did not extend to unusually dangerous conditions such as the abrupt change in elevation, misalignment, and change from asphalt to gravel surface.
The State has a specific duty to mark its highways to alert unwary drivers to unusually dangerous conditions. Cooke v. Travelers Ins. Co., 590 So.2d 657 (La.App. 3 Cir.1991), writ denied, 592 So.2d 414 (La. 1992). This duty is owed to prudent and perhaps momentarily inattentive drivers as well as to their passengers. Breach of this duty constitutes fault. Molbert v. Toepfer, 550 So.2d 183 (La.1989). We have already determined that the trial court did not commit manifest error in failing to find that the drop in elevation, misalignment, and change from asphalt to gravel in the absence of any specific warning constituted an unreasonably dangerous or defective condition. Nevertheless, inadequately or improperly signed intersections can create an unusually hazardous risk to drivers exercising ordinary care and reasonable prudence; therefore, this condition can give rise to liability. Cooke, 590 So.2d 657. The warnings on a road should be adequate to alert the ordinary and reasonably prudent motorist about the nature and character of the road. Lam v. State, DOTD, 495 So.2d 359 (La.App. 3 Cir.), writ denied, 497 So.2d 1017 (La.1986). Whether a warning is adequate to satisfy the State's duty depends on several factors, including the nature and location of the road and the speed and kind of vehicular travel. Lam, 495 So.2d 359.
DOTD has a duty to properly sign and maintain its roads and highways in a condition which is reasonably safe for prudent drivers exercising ordinary care. Newsom v. State, DOTD; 93-815 (La.App. 3 Cir. 3/30/94); 640 So.2d 374, writ denied, 94-1118 (La. 6/24/94); 641 So.2d 207. There was no evidence introduced at trial nor any contention by the plaintiffs at trial or on appeal that the State had failed to properly maintain Highway 370. Rather, plaintiffs' assertions that the State was strictly liable and negligent are based on the State's alleged failure to warn about the change in elevation, misalignment, and change from asphalt to gravel surface.
With respect to the configuration of the highway and the State's alleged failure to adequately warn of Highway 370's abrupt turn, the trial court found that DOTD had not failed in its duty to warn travelers intending to follow the indicated route of Highway 370 because the signs in place before the intersection, "if obeyed by an attentive driver, reasonably inform the driver of the configuration of the highway." Those signs were: (1) drive carefully, substandard roadway; (2) advance turn assembly, with 15 m.p.h. speed advisory plate; (3) advance route marker assembly; (4) route assembly at turn of Highway 370; and (5) object marker at turn of Highway 370. "As such, the Court cannot say that these signs, or lack thereof presented an unreasonable risk of harm."
The trial court determined that DOTD had not failed in its duty to warn travelers intending to follow the indicated route of Highway 370. Luther Cox, plaintiffs' expert in mechanical engineering, accident reconstruction and causation, testified that the intersection was defectively signed because: (1) there should be a stop sign to stop the traffic traveling east along Highway 370 along with the one in place to stop the westbound traffic, and (2) because the turn advisory sign indicated that there was a curve rather than an intersection. Duaine T. Evans, plaintiffs' expert in traffic engineering and accident reconstruction, testified that the driver was *1164 faced with conflicting messages because the road crossing was a curve and not an intersection. Also, there were no signs indicating that a driver could not go straight ahead. Evans believed that a 4-way stop was needed because having only three stop signs caused driver confusion. Evans explained that in his opinion the signs in place only tell a driver that the route turns but not that the road turns and that a driver has a right to expect sign alerting him that he cannot travel straight ahead.
The defendants' expert, Dr. Blaschke, was accepted by the court as an expert in traffic engineering with a subspecialty in human factors, including the effect of alcohol on a driver, and testified that the signs in place were correct for Highway 370 because they tell a driver to turn left to stay on Highway 370 and that these signs do not tell a driver that the road goes straight. He further testified that the series of signs along Highway 370 indicate that the road turns, that an intersection is ahead, and that a sharp turn to the left is necessary to stay on Highway 370.
Defendants' expert, Dr. Blaschke, also testified that nothing in the AASHTO manual was contrary to the design of the intersection and that the stop sign is the least favorite traffic control mechanism because it requires a stop. He testified that a 4-way stop is only justified when there is a high volume of traffic; they are very rare in rural areas. There had been five accidents a year at a particular location which could be corrected by a 4-way stop. He opined that the traffic volume at this intersection was not high enough to warrant a 4-way stop, that there had not been five accidents per year, and that this intersection was not on the list of abnormal intersections. He opined that the series of signs approaching this intersection were satisfactory and that he would not change them absent a problem. Blaschke also testified that one does not want to over-sign an intersection, that the goal is to minimize delay and maximize safety. He testified that there was no logical reason for a driver to lose control at this intersection if he were sober and attentive. He opined that the car's path was more indicative of an impaired driver, rather than a sober driver, and that there was sufficient information for a driver behaving in a prudent and sober manner to negotiate the roadway without a problem. He testified that the failure to do so indicates inattentiveness, impairment or a combination of the two.
Trooper Leger testified that he had investigated four or five accidents at this intersection. All accidents involved drivers who lost control proceeding from Highway 370 to Parish Road 3-69. He testified that speed in excess of 40 m.p.h. would cause a driver to lose control when entering the intersection and a driver would end up in a ditch. He testified that excessive speed was the reason for loss of control in most accidents, and that two or three of them involved an intoxicated driver. He testified that the whole area was lightly traveled.
Based on the foregoing, we conclude that there was ample evidence in the record to support the trial court's determination that the intersection was properly signed. In our opinion, the entire intersection and its approach from Highway 370 was sufficiently signed to give adequate and timely notice of the configuration and conditions of the road. We therefore agree with the trial court that the State had no additional duty to specifically warn about the change in elevation, misalignment and change from asphalt to gravel surface. See Lam, 495 So.2d 359. In fact, the only evidence at trial introduced by plaintiffs about the measures that the DOTD should have taken to warn about the change in elevation, misalignment, and change from asphalt to gravel surface was the installation of a stop sign to stop the traffic traveling east along Highway 370 when it curves north. Accordingly, the second assignment of error asserted by the Heberts and Feerick lacks merit.
By McSpadden's second assignment of error, he contends that the trial court erred in accepting the opinion of defendants' expert Dr. Blaschke over plaintiffs' experts Cox and Evans because Blaschke had not reconstructed the accident; whereas, plaintiffs' experts had.
"Where the testimony of expert witnesses differ, it is the responsibility of the *1165 trier of fact to determine which evidence is the most credible." Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1111 (La.1990). A factual finding, based upon a credibility determination, may not be disturbed on appeal absent manifest error. Phillips v. Fisher, 93-928 (La.App. 3 Cir. 3/2/94); 634 So.2d 1305, writ denied, 94-0813 (La. 5/6/94); 637 So.2d 1056. Furthermore, a trial court's decision to accept the opinion of one expert and to reject that of another can virtually never be manifestly erroneous. Arabie v. City of Eunice, 629 So.2d 465 (La.App. 3 Cir.1993). The only time this decision will be deemed manifestly erroneous is when the court was clearly wrong in accepting the expert's opinion upon which it relied. It is within the trial court's discretion to accept an expert's opinion if his or her opinion is not based upon an incorrect assumption of the facts and if the opinion is supported by the record. Babineaux v. Tollie Freightways, Inc., 628 So.2d 1327 (La.App. 3 Cir.1993).
After a thorough review of the record, we find ample evidence to support a determination that Blaschke's opinion was credible. He was qualified and his opinion was not based upon an incorrect assumption of facts. Since there is a reasonable basis in the record for the acceptance of Blaschke's opinion, we conclude that the trial court did not manifestly err in relying on Blaschke's opinion. Thus, this assignment of error is without merit.
By the third assignment of error asserted by the Heberts and Feerick, they contend that the trial court erred in holding that the State had no constructive notice of its failure to warn and of the hazardous road conditions.
As discussed above, to recover against the State under negligence or strict liability theory, a plaintiff must establish that the defendant had actual or constructive notice of the purported dangerous condition and failed to remedy it within a reasonable amount of time. La.Civ.Code art. 2315; La.Civ.Code art. 2317; La.R.S. 9:2800; Oster, 582 So.2d 1285. Based on our determination that the change in elevation, misalignment, and change from asphalt to gravel surface were not defective or unreasonably dangerous conditions and that the State had no additional duty to specifically warn about these conditions, the third assignment of error asserted by the Heberts and Feerick on the issue of the State's notice necessarily lacks merit. Notwithstanding the foregoing, we note that the trial court concluded in its written reasons for judgment that: "Plaintiffs' claims against the DOTD must also fail on the issue of notice. The Court gave plaintiffs every opportunity to discover all remotely relevant accidents. Despite this fact, plaintiffs could not show through accident history, written complaints to the DOTD or otherwise that the State had any knowledge, actual or constructive, of a defect at this location. As notice is an essential element for recovery against the DOTD, plaintiffs' claims against the DOTD are not viable." The trial court's factual determinations are supported by the record. Thus, we are unable to conclude based on a review of the record that the trial court was clearly wrong in finding that the State had no notice of the alleged dangerous conditions. Consequently, the third assignment of error asserted by the Heberts and Feerick lacks merit.

ACADIA PARISH
In McSpadden's appeal, he asserts that the Parish was concurrently liable with DOTD for defective condition at intersection and considered a separate analysis to be unnecessary. We have considered all of McSpadden's arguments directed at DOTD and found them to lack merit because we have determined that the signs at the intersection were adequate and that the trial court was not clearly wrong in finding that change in elevation was not unreasonably dangerous; therefore, Parish of Acadia had no duty to warn about the change in elevation and is neither strictly liable nor negligent on this basis. The only basis at trial which the plaintiffs urged for Acadia Parish's liability which was not also directed at DOTD was that Acadia Parish failed to properly maintain Parish Road 3-69, and as a result, the surface of the roadway was substandard. In written reasons for judgment, the trial court wrote, "the Court finds that there was nothing in the condition of the surface of 3-69 which constituted a defect or *1166 an unreasonably dangerous condition." The record demonstrates that Feerick testified that he tripped in several potholes along Parish Road 3-69 when he was trying to get help; Herbert J. Thibodeaux, Acadia Parish bus driver, and Joseph Roy Thibodeaux, who live near the intersection, testified that there were wash boards and ruts on Parish Road 3-69. Joseph Thibodeaux testified that he never notified Acadia Parish that he thought the road conditions were hazardous. Trooper Leger, Trooper LeBoeuf, James Reed, and Curney Haure walked the surface of the roadway within hours after the accident. They looked for "pot holes," a "scrub board" or any other substandard conditions, and all testified that there were no such conditions present. Photographs taken of the surface of the road at this time confirms their testimony. While investigating the accident, Trooper LeBoeuf noted that the gravel on Parish Road 3-69 was dry. Reed, who was the road supervisor for Acadia Parish at the time of the accident, testified that Parish Road 3-69 was graded in February, July, and October of 1991, and that the Parish of Acadia had a regular maintenance schedule for this road. Additionally, he testified that he had received no other complaints about the road in 1991. Based on the foregoing, we find no manifest error in the trial court's determination that condition of the surface of Parish Road 3-69 did not constitute a defect or an unreasonably dangerous condition.
In their seventh assignment of error, the Heberts and Feerick contend that the trial court erred in not finding the Parish of Acadia liable for failure to remove the guy anchor because it maintained the ditch where the guy wire was located. We have already determined that the trial court was not clearly wrong in finding that the placement of the wire or anchor was not defective or unreasonably dangerous. Furthermore, in considering whether the Parish is liable for the placement of the SLEMCO anchor because it maintains the ditch, we must consider the intended use and purpose of the ditch in determining whether the Parish has a duty. Oster, 582 So.2d 1285; Perkins v. State DOTD, 515 So.2d 553 (La.App. 1 Cir.), writ denied, 515 So.2d 1114 (La.1987). Pursuant to La.R.S. 48:1(22), the statutory purpose for roadside ditches is drainage. Simply put, they are not intended for vehicular use. As the first circuit stated in Perkins, 515 So.2d at 555, "[b]ecause the roadside ditch is intended for drainage and not vehicular use, there was no duty on the part of ... the Parish to construct or maintain the utility pole located on the back of the ditch in such a way that it did not pose an unreasonable risk of danger for vehicles in the ditch." Furthermore, since we agree with the trial court that the SLEMCO utility pole did not present an unreasonable risk of harm, there was no duty on the part of Acadia Parish to remove the guy wire and anchor. Thus, the seventh assignment of error asserted by the Heberts and Feerick lacks merit.
Since we have concluded that the trial court was not wrong in concluding that SLEMCO, DOTD, and Acadia Parish were not liable to plaintiffs, McSpadden's fourth assignment of error, that the trial court erred in not awarding McSpadden damages, necessarily lacks merit.

DECREE
The trial court's judgment dismissing all of plaintiffs' claims against SLEMCO, DOTD, and Acadia Parish is affirmed in all respects. Costs of this appeal are assessed to appellants.
AFFIRMED.
NOTES
[1] This case was consolidated with 95-406; Kemper McSpadden v. Southwest Louisiana Electric Membership Corporation, et al., 666 So.2d 1199 (La.App. 3 Cir.1995). The plaintiffs in the present case, 95-405, are James Hebert and Mary Hebert, parents of Steve Hebert, and Chad Feerick. The plaintiff in the companion case, 95-406, is Kemper McSpadden. We discuss both cases in this opinion.